Julio D. LABOY, Petitioner,

v.

The STATE OF NEW JERSEY and Warden of the New Jersey State Prison at Trenton, Respondents.

Civ. No. 1220-66.

United States District Court
D. New Jersey.

March 14, 1967.

Alfred Abbotts, Trenton, N. J., for petitioner.

Vincent P. Keuper, Prosecutor, Monmouth County, by Thomas L. Yaccarino, Asbury Park, N. J., for respondents.

## MEMORANDUM AND ORDER

LANE, District Judge:

Petitioner's application for a writ of habeas corpus has been allowed to be filed in forma pauperis. Petitioner is incarcerated in the New Jersey State Prison, Trenton, serving a term of life imprisonment imposed by the Monmouth County Court on October 11, 1963, after the retraction of a previously entered plea of not guilty and the entering of a plea of non vult to an indictment charging petitioner with murder.

It is petitioner's contention that his plea of non vult was not voluntarily entered in that (1) he did not and could not understand what was transpiring since his mental capacity was that of a moron; and (2) his mind was overborne by psychological coercion and fear of the electric chair. Petitioner has sufficiently exhausted his state remedies.

The transcript of the proceeding in the Monmouth County Court at which petitioner entered the plea of non vult reveals explicit avowals by petitioner in open court as to the voluntariness of his plea. Other statements indicating that petitioner was aware of the nature of the proceedings also appear in the tran-

script as well as oral answers to the questions provided in the Form 13A required by N.J.R.R. 3:5-2(b). It is petitioner's contention, however, that we should go behind that record and should make an independent inquiry into the voluntariness of his plea. See, e. g., United States ex rel. Perpiglia v. Rundle, 221 F.Supp. 1003, 1006 (E.D.Pa.1963). In light of his allegations, we signed an order to show cause, appointed counsel, and held a hearing.

Petitioner was born in Pattillas, Puerto Rico, on December 21, 1935, and came to the United States in 1951. Although he now speaks and understands English fairly well, an interpreter was provided at the hearing to make sure there would be no communication difficulties.

The murder for which petitioner was convicted was a felony murder of a gas station attendant during a robbery on November 23, 1962. Petitioner's alleged participation in the holdup was that he parked the getaway car and was the "lookout." Petitioner was arrested the following day and on November 26 gave a statement to the police in which he admitted that he participated in the robbery. On November 30 he was given a psychiatric examination at the request of the Monmouth County Prosecutor's office. The report concluded that petitioner had a mental inadequacy but had sufficient mental capacity to have criminal responsibility and to cooperate in his own defense. Petitioner was taken to the Monmouth County Court on December 17, 1962, where he entered a plea of not guilty. The court told him that if he did not have sufficient funds an attorney would be appointed for him.

On December 21, 1962, Peter Cooper, Esquire, was notified that he had been appointed to defend petitioner. On that day Mr. Cooper and an associate, Mr. David Knapp, went to the county jail in Freehold to talk with petitioner. According to Mr. Cooper they were able to converse in English and although he realized that petitioner was of low intelligence he "felt that he [Laboy] could thoroughly understand me and what I

was saying, and I took extensive notes on what he told me * * *." They discussed the facts of the crime but did not discuss the possibility of entering a plea because there had been no indication that the court would accept a plea. At this first meeting Mr. Cooper became aware that petitioner had already given a statement to the police.

Mr. Cooper next visited petitioner on January 4, 1963, and by this time he had obtained a copy of the confession. They discussed the statement and petitioner indicated that it was incorrect in several respects. The points with which petitioner took issue were minor and did not amount to a denial of participation in the crime charged. Mr. Cooper testified that he was positive that petitioner at this time understood their conversation.

The third visit by counsel took place on January 18, 1963. Mr. Cooper testified that on this occasion petitioner appeared to be "more concerned about his plight and was upset."

On January 25, 1963, petitioner underwent another psychiatric examination at the request of the Prosecutor after the jail warden reported bizarre and unusual behavior. Petitioner had become depressed, complained of headaches, and refused food. There was a fire in his cell which was suspected to be a suicide attempt. Subsequently he was found sitting on the floor of his cell sobbing convulsively. He apparently had become obsessed with the fear of death and the fear of the electric chair. He also experienced delusions and auditory hallucinations. No diagnosis was given but it was recommended that petitioner be sent to the State Hospital for further study, and on January 26 he was committed to the hospital. Petitioner was treated with tranquilizers and appeared to respond well. However, soon thereafter, he became agitated, very confused, and extremely delusional. He was given a series of shock treatments which were completed on May 3, 1963, and according to the State Hospital's "Summary of Hospitalization," responded very satisfactor-

ily. It is indicated that petitioner showed some amnesia of events prior to his hospitalization but was "able to recall the incidents of the crime." He was returned to the Monmouth County Jail on September 19, 1963.

On May 15, 1963, while petitioner was still at the State Hospital, Mr. Cooper, together with Mr. Knapp, visited him. Mr. Cooper says that petitioner appeared calm and less upset. He indicates that at this time he had some discussion with petitioner about the case but the discussion was in general terms because counsel felt that petitioner's ability to comprehend was somewhat impaired.

Petitioner's testimony with respect to the period before his release from the State Hospital on September 19, 1963, is that he has no recollection of speaking with Mr. Cooper prior to the time on May 15, 1963, in the hospital. Petitioner also testified that he has no recollection of the facts surrounding the murder charge. The Hospital Summary, however, indicates that petitioner talked with the doctors about the facts of his case. Petitioner agrees that it is possible that he gave this information to the doctors who interviewed him, but contends that he learned of these facts from Mr. Cooper when he visited him in the hospital. Mr. Cooper's testimony to the effect that they only had a general discussion about the case does not support petitioner's assertion. Mr. Cooper also indicated that petitioner was not unfamiliar with the case when he spoke with him in the hospital.

On September 20, 1963, the day after petitioner's return from the State Hospital, Mr. Cooper visited him in the county jail. On this occasion counsel's testimony is that he again explained to petitioner the nature of the charge, the possible pleas that could be entered, the degrees of punishment including the possibility of the electric chair, and the fact that he had a right to go to trial. Mr. Cooper was aware at this time that the Prosecutor would not contest the acceptance of a non vult plea.

The next meeting between petitioner and Mr. Cooper was on the morning of September 30, 1963, in the county jail. From there they both went to the Prosecutor's office where they again conferred, this time with an interpreter. They then went up to the courtroom to enter a plea of non vult. The judge, however, was not satisfied that petitioner understood the questions and refused to accept the plea. Counsel and petitioner went back to the Prosecutor's office and counsel, through an interpreter, again explained the situation. They went back up to the courtroom and this time the judge was satisfied that petitioner understood what he was doing. Petitioner indicated that he knew the nature of the charge, the effect of the plea, and that it was his voluntary act.

Petitioner now contends that the entering of the non vult plea was not a voluntary act. Although petitioner says that he knew that he was going to court to plead guilty (non vult) to the charge of murder, "the only thing that I understood was that declaring myself guilty I would be saving myself from the electric chair. * * *" Petitioner says that what he wanted to do at that time was to go to trial. His reasons for not informing his counsel or the court of this were that he was very confused and felt uncomfortable. When asked if he was afraid of going to the electric chair if he did not plead guilty, petitioner answered, "And who is not afraid of something like that?"

█ Turning now to petitioner's application for habeas corpus relief, his first contention is that he did not have the mental capacity to understand what was transpiring at the time that he entered his plea. Although the "Summary of Hospitalization" at the time petitioner was admitted to the State Hospital indicates that he had been functioning on a level varying from Moron to Low-Grade Moron, the same Summary at the time of his release indicates that according to the hospital's own tests it is most likely that he had been functioning at a borderline to dull-normal level. Mr.

Cooper's testimony is that he felt that petitioner was capable of understanding the proceedings. Our observation of petitioner during the hearing before us supports this,—he appeared to be functioning at a level well within adequate capability. Moreover, petitioner himself testified that he understood that he was going to court to enter a guilty plea.

■ As to petitioner's second contention,—that his mind was overborne by psychological coercion and fear of the electric chair,—we find that this claim is also without merit. The only factual basis that we have found in the record for this claim is that petitioner was afraid that if he did not plead guilty he would be sent to the electric chair. The record reveals that petitioner was greatly upset by the possibility of receiving the death penalty. This was apparently heightened by the fact that he had difficulty understanding how he could be held for murder when he did not participate in the actual shooting. All of this finally led to a temporary mental breakdown. Petitioner was hospitalized for a period of some eight months during which time he received treatment and gradually recovered. After his return to Monmouth County, Mr. Cooper again explained to him the various choices. Petitioner understood that if the court accepted his plea of non vult, the death penalty could not be imposed. N.J.Stat. Ann. § 2A:113–3. While we realize that petitioner was faced with a difficult choice we do not feel that this vitiated the voluntariness of his non vult plea. Plea bargaining such as this has been expressly approved by the courts and has been held not to render the plea involuntary. See Gilmore v. People of State of California, 364 F.2d 916 (9th Cir. 1966); Cooper v. Holman, 356 F.2d 82 (5th Cir. 1966); Busby v. Holman, 356 F.2d 75 (5th Cir. 1966); United States ex rel. Robinson v. Fay, 348 F.2d 705 (2d Cir. 1965); Martin v. United States, 256 F.2d 345 (5th Cir. 1958); Godlock v. Ross, 259 F.Supp. 659 (E.D. N.C.1966); see generally Cortez v. United States, 337 F.2d 699 (9th Cir. 1964); Lattin v. Cox, 355 F.2d 397 (10th Cir. 1966). Petitioner's choice was not "a choice between the rock and the whirlpool." Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). We feel confident that petitioner understood the alternatives which were open to him and that the plea of non vult [1] was the result of a voluntary and considered choice on his part.

Although not argued in petitioner's application, this case presents another question which we feel should be ruled upon. In the recent case of United States v. Jackson, 262 F.Supp. 716 (D. Conn.1967), appeal docketed, No. 1236, 35 U.S.L.WEEK 3367 (U.S., April 7, 1967), it was held that the Federal Kidnapping Act, 18 U.S.C. § 1201(a), was unconstitutional. Under the terms of the Act the death penalty can be imposed only if the jury recommends it. It provides:

"Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully siezed, confined, inveigled, decoyed, kidnaped, abducted, or carried away and held for ransom or reward or otherwise, except in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and *if the verdict of the jury shall so recommend,* or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed." (Emphasis added.)

Thus, under the statute, by asserting his right to a jury trial a defendant has to expose himself to the risk of the death

---

1. Although the terms "non vult" and "guilty" were used interchangeably throughout the arraignment, it is clear that the plea of non vult was being entered. The synonymous usage is consistent with the presiding judge's explanation of the effect of a non vult plea. However, since New Jersey law bars a plea of guilty to a murder indictment, the Judgment of Conviction which asserts the entry of a guilty plea, should be corrected.

penalty, whereas if he waives a jury or enters a plea of guilty, the risk of death is substantially reduced. *Jackson* holds that the choice required by the Act violates a defendant's sixth amendment right to a jury trial. The question was presented on defendants' motion to dismiss their indictments which were granted as to the kidnapping count.[2]

■■ The situation under the New Jersey law with respect to the entering of a non vult plea is analogous to the Federal Kidnaping Act. A person against whom a murder indictment is returned has only two choices: (1) he can enter a plea of non vult, which, if accepted,[3] will subject him to a penalty of at most a term of life imprisonment, or (2) he can enter a plea of not guilty which will result in a jury trial and, if convicted, the possibility of the death sentence. Under New Jersey rules a defendant may not be tried without a jury in a murder case. See N.J.R.R. 3:7–1(a).

If the sixth amendment right to a jury trial in a criminal case applies to the states by virtue of the fourteenth amendment,[4] it can be argued that the reasoning in the *Jackson* case would result in a finding that the New Jersey procedure is unconstitutional since under New Jersey law only the jury may impose the death penalty.

Concededly, the fact that only a jury may impose the death penalty is a factor which weighs against entering a plea of not guilty and undergoing trial by a jury. However, we disagree with the conclusion that the *Jackson* case draws from this. It does not necessarily follow that this "obstacle" to a jury trial is tantamount to a *denial* of the right to a jury trial.

To determine when such an "obstacle" becomes so great as to be considered a denial of the right to a jury trial, it is necessary to compare the degree of the "obstacle" against the value of the policy which it implements.

The New Jersey procedure involved in the instant case enunciates a legislative policy which deems it unwise to allow a judge acting alone to impose the death penalty. In this state the death penalty may be imposed only when a jury of twelve of the defendant's peers decides that it is appropriate. Presumably, the legislative branch has determined that the imposition of the death penalty is such a serious decision that it is unfair to the defendant (and possibly to the judge) to have it rest on the shoulders of one man; that such a decision can only be entrusted to twelve fair and open-minded citizens whose values approximate those of the community from which they are chosen.

This is a valid legislative policy which operates primarily for the class of defendants of which petitioner is a member. The fact that the procedure which implements this policy may in some cases influence a defendant, who has evaluated the alternatives open to him, to forego a trial by jury does not, in our opinion, invalidate the statutory scheme. The benefit which results from the procedure is sufficiently great that we are not compelled to strike it down in the name of providing an unobstructed choice of a trial by jury.

Now, therefore, it is on this 14th day of March, 1967, ordered that the relief requested by petitioner be denied and that his petition for a writ of habeas corpus be and hereby is dismissed.

2. It should be noted that the court could have limited its relief by striking the objectionable part of the statute and allowing defendants to go to a jury trial without being subject to the death penalty.

3. The choice of whether to accept a non vult plea is a matter within the discretion of the trial court. For a discussion of this and the role that the prosecutor plays in the court's decision, see State v. Belton, 48 N.J. 432, 226 A.2d 425 (1967).

4. This question has not yet been ruled upon. See Turner v. State of Louisiana, 379 U.S. 466, 471, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); see also Estes v. State of Texas, 381 U.S. 532, 559–560, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Warren, C. J., concurring opinion).