## UNITED STATES *v.* JACKSON ET AL.

No. 85. Argued December 7, 1967.—Decided April 8, 1968.

*Ralph S. Spritzer* argued the cause for the United States. With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Vinson, Richard A. Posner, Beatrice Rosenberg* and *Marshall Tamor Golding.*

*Steven B. Duke* argued the cause for appellees. With him on the brief for appellee Jackson was *Stephen I. Traub. Ira B. Grudberg* was on the brief for appellee Walsh.

MR. JUSTICE STEWART delivered the opinion of the Court.

The Federal Kidnaping Act, 18 U. S. C. § 1201 (a), provides:

"Whoever knowingly transports in interstate . . . commerce, any person who has been unlawfully . . . kidnaped . . . and held for ransom . . . or other-

wise . . . shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed."

This statute thus creates an offense punishable by death "if the verdict of the jury shall so recommend." The statute sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or upon one who pleads guilty.

On October 10, 1966, a federal grand jury in Connecticut returned an indictment charging in count one that three named defendants, the appellees in this case, had transported from Connecticut to New Jersey a person who had been kidnaped and held for ransom, and who had been harmed when liberated.[1] The District Court dismissed this count of the indictment,[2] holding the Federal Kidnaping Act unconstitutional because it makes "the risk of death" the price for asserting the right to jury trial, and thereby "impairs . . . free exercise" of that constitutional right.[3] The Government appealed

---

[1] Count one:

"On or about September 2, 1966, CHARLES JACKSON, also known as 'Batman,' also known as 'Butch'; and GLENN WALTER ALEXANDER DE LA MOTTE; and JOHN ALBERT WALSH, JR., the defendants herein, did knowingly transport in interstate commerce from Milford in the District of Connecticut to Alpine, New Jersey, one John Joseph Grant, III, a person who had theretofore been unlawfully seized, kidnapped, carried away and held by the defendants herein, for ransom and reward and for the purpose of aiding the said defendants to escape arrest, and the said John Joseph Grant, III, was harmed when liberated, in violation of Title 18, United States Code, Section 1201 (a)."

[2] Count two, charging transportation of a stolen motor vehicle from Connecticut to New York in violation of 18 U. S. C. § 2312, has not been challenged and is not now before us.

[3] 262 F. Supp. 716, 718.

directly to this Court,[4] and we noted probable jurisdiction.[5] We reverse.

We agree with the District Court that the death penalty provision of the Federal Kidnaping Act imposes an impermissible burden upon the exercise of a constitutional right, but we think that provision is severable from the remainder of the statute. There is no reason to invalidate the law in its entirety simply because its capital punishment clause violates the Constitution. The District Court therefore erred in dismissing the kidnaping count of the indictment.

## I.

One fact at least is obvious from the face of the statute itself: In an interstate kidnaping case where the victim has not been liberated unharmed, the defendant's assertion of the right to jury trial may cost him his life, for the federal statute authorizes the jury—and only the jury—to return a verdict of death. The Government does not dispute this proposition. What it disputes is the conclusion that the statute thereby subjects the defendant who seeks a jury trial to an *increased* hazard of capital punishment. As the Government construes the statute, a defendant who elects to be tried by a jury cannot be put to death even if the jury so recommends— unless the trial judge agrees that capital punishment should be imposed. Moreover, the argument goes, a defendant cannot avoid the risk of death by attempting to plead guilty or waive jury trial. For even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free, in the Government's view of the statute, to convene a special jury for the limited purpose of deciding whether to recommend the death penalty. The Government thus contends that, whether or not the

[4] 18 U. S. C. § 3731.
[5] 387 U. S. 929.

defendant chooses to submit to a jury the question of his guilt, the death penalty may be imposed if and only if both judge and jury concur in its imposition. On this understanding of the statute, the Government concludes that the death penalty provision of the Kidnaping Act does not operate to penalize the defendant who chooses to contest his guilt before a jury. It is unnecessary to decide here whether this conclusion would follow from the statutory scheme the Government envisions,[6] for it is not in fact the scheme that Congress enacted.

At the outset, we reject the Government's argument that the Federal Kidnaping Act gives the trial judge discretion to set aside a jury recommendation of death. So far as we are aware, not once in the entire 34-year history of the Act has a jury's recommendation of death been discarded by a trial judge.[7] The Government would

---

[6] Even if the Government's interpretation were sound, the validity of its conclusion would still be far from clear. As the District Court observed, "even if the trial court has the power to submit the issue of punishment to a jury, that power is discretionary, its exercise uncertain." 262 F. Supp. 716, 717–718. The Government assumes that a judge who would accept the death penalty recommendation appended to a jury verdict of guilt is a judge who would exercise his discretionary power to convene a penalty jury if the defendant were to plead guilty or submit to a bench trial. But the mere fact that a judge would defer to the jury's recommendation hardly implies that he would take the extraordinary step of convening a penalty jury after accepting a plea of guilty or approving a waiver of jury trial. Even if the Government's statutory position were correct, the fact would remain that the defendant convicted on a guilty plea or by a judge completely escapes the threat of capital punishment unless the trial judge makes an affirmative decision to commence a penalty hearing and to impanel a special jury for that purpose, whereas the defendant convicted by a jury automatically incurs a risk that the same jury will recommend the death penalty and that the judge will accept its recommendation.

[7] One district judge has indicated that he would not feel bound by a jury recommendation of death in a kidnaping case, see *Robinson* v. *United States*, 264 F. Supp. 146, 151–153, but the question

apparently have us assume either that trial judges have always agreed with jury recommendations of capital punishment under the statute—an unrealistic assumption at best [8]—or that they have abdicated their statutory duty to exercise independent judgment on the issue of penalty. In fact, the explanation is a far simpler one. The statute unequivocally states that, "if the verdict of the jury shall so recommend," the defendant "shall be punished . . . by death . . . ." The word is "shall," not "may." [9] In acceding without exception to jury recom-

was not directly before him since the case involved a petition for post-conviction relief. Although federal juries have recommended capital punishment in a number of kidnaping cases, counsel for the Government stated at oral argument in this Court that he was aware of no case in which such a recommendation had been set aside.

[8] See H. Kalven & H. Zeisel, The American Jury 436–444 (1966).

[9] The Government notes that the word "shall" precedes *both* alternative punishments: The offender "shall be punished (1) by death if the kidnaped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment . . . ." But the notion that judicial discretion is thereby authorized is dispelled by the qualification attached to the second alternative: "by imprisonment . . . *if the death penalty is not imposed.*" Although it is true that the judge rather than the jury is formally responsible for imposing sentence in a federal criminal case, those qualifying words would state a pointless truism unless they were meant to refer to the jury's recommendation: The offender "shall be punished (1) by death . . . if the verdict of the jury shall so recommend, or (2) by imprisonment" if the jury's verdict does *not* so recommend. To accept the Government's reading of the statute would make its final phrase a complete redundancy, anomalous indeed in a statute that Congress has twice pruned of excess verbiage. See Reviser's Note following 18 U. S. C. § 1201.

Nothing in the language or history of the Federal Kidnaping Act points to any such result. On the contrary, an examination of the death penalty provision in its original form demonstrates that

mendations of death, trial judges have simply carried out the mandate of the statute.

The Government nonetheless urges that we overlook Congress' choice of the imperative. Whatever might have been assumed in the past, we are now asked to construe the statute so as to eliminate the jury's power to fix the death penalty without the approval of the presiding judge. "[T]his reading," it is said, would conform "to the long tradition that makes the trial judge in the federal courts the arbiter of the sentence." And so it would. The difficulty is that Congress intentionally discarded that tradition when it passed the Federal Kidnaping Act. Over the forcefully articulated objection that jury sentencing would represent an unwarranted departure from settled federal practice,[10] Congress rejected a version of the Kidnaping Act that would have

---

Congress could not have intended the meaning the Government now seeks to attribute to it. For the statute as it stood in 1934 provided that the offender "shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine . . . ." 48 Stat. 781. In this form, the statutory language simply will not support the interpretation that the offender "shall be punished by death *or* by imprisonment" if the jury recommends the death penalty. For the statute in this form makes unmistakably clear that, if the death penalty applies— *i. e.,* if the jury has recommended death—then the punishment *shall* be death unless, before the judge has imposed sentence, the victim has been liberated unharmed. There is absolutely no reason to think that the purely formal transformations through which the statute has passed since 1934 were intended to alter this basic penalty structure.

[10] See 75 Cong. Rec. 13288, 13295–13297 (1932).

left punishment to the court's discretion [11] and instead chose an alternative that shifted from a single judge to a jury of 12 the onus of inflicting the penalty of death.[12] To accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands.

The thrust of the clause in question was clearly expressed by the House Judiciary Committee that drafted it: Its purpose was, quite simply, "to permit the jury to *designate* a death penalty for the kidnaper." [13] The fact that Congress chose the word "recommend" to describe what the jury would do in designating punishment cannot obscure the basic congressional objective of making the jury rather than the judge the arbiter of the death sentence. The Government's contrary contention cannot stand.

Equally untenable is the Government's argument that the Kidnaping Act authorizes a procedure unique in the federal system—that of convening a special jury, without the defendant's consent, for the sole purpose of deciding

---

[11] As originally drafted, the Kidnaping Act had provided for punishment "by death or imprisonment . . . for such term of years as the court in its discretion shall determine. . . ." 75 Cong. Rec. 13288 (1932).

[12] A number of Congressmen feared that empowering judges to impose capital punishment might make some jurors unduly reluctant to convict. See 75 Cong. Rec. 13289, 13294 (1932). To the extent that this concern was responsible for the decision to require a jury recommendation of death as a prerequisite to the imposition of capital punishment, it is of course immaterial whether or not the jury's recommendation is binding on the trial judge. But, as the Government concedes, many of the Congressmen who favored jury determination of the death penalty did so largely because such a scheme would take from the judge the onus of inflicting capital punishment. See, *e. g.*, 75 Cong. Rec. 13297.

[13] H. R. Rep. No. 1457, 73d Cong., 2d Sess., 2 (1934) (emphasis added).

whether he should be put to death. We are told initially that the Federal Kidnaping Act authorizes this procedure by implication. The Government's reasoning runs as follows: The Kidnaping Act permits the infliction of capital punishment whenever a jury so recommends. The Act does not state in so many words that the jury recommending capital punishment must be a jury impaneled to determine guilt as well. Therefore the Act authorizes infliction of the death penalty on the recommendation of a jury specially convened to determine punishment. The Government finds support for this analysis in a Seventh Circuit decision construing the Federal Kidnaping Act to mean that the death penalty may be imposed whenever "an affirmative recommendation [is] made by a jury," including a jury convened solely for that purpose after the court has accepted a guilty plea. *Seadlund* v. *United States,* 97 F. 2d 742, 748. Accord, *Robinson* v. *United States,* 264 F. Supp. 146, 153. But the statute does not say "a jury." It says *"the* jury." At least when the defendant demands trial by jury on the issue of guilt, the Government concedes that "the verdict of the jury" means what those words naturally suggest: the general verdict of conviction or acquittal returned by the jury that passes upon guilt or innocence. Thus, when such a jury has been convened, the statutory reference is to that jury alone, not to a jury impaneled after conviction for the limited purpose of determining punishment.[14] Yet the Government argues that, when the issue of guilt has been tried to a judge or has been eliminated altogether by a plea of guilty, "the verdict of the jury" at once assumes a completely new meaning. In such a case, it is said, "the verdict of the jury" means the recommen-

[14] If the jury's verdict of guilt includes no death penalty recommendation, the judge can impose no penalty beyond imprisonment. He cannot convene another jury to recommend capital punishment. See *United States* v. *Dressler,* 112 F. 2d 972, 980.

dation of a jury convened for the sole purpose of deciding whether the accused should live or die.

The Government would have us give the statute this strangely bifurcated meaning without the slightest indication that Congress contemplated any such scheme. Not a word in the legislative history so much as hints that a conviction on a plea of guilty or a conviction by a court sitting without a jury might be followed by a separate sentencing proceeding before a penalty jury. If the power to impanel such a jury had been recognized elsewhere in the federal system when Congress enacted the Federal Kidnaping Act, perhaps Congress' total silence on the subject could be viewed as a tacit incorporation of this sentencing practice into the new law. But the background against which Congress legislated was barren of any precedent for the sort of sentencing procedure we are told Congress impliedly authorized.

The Government nonetheless maintains that Congress' failure to provide for the infliction of the death penalty upon those who plead guilty or waive jury trial was no more than an oversight that the courts can and should correct. At least twice, Congress has expressly authorized the infliction of capital punishment upon defendants convicted without a jury,[15] but even on the assumption

---

[15] In a statute forbidding the wrecking of trains, Congress provided that "[w]hoever is convicted of any such crime, which has resulted in the death of any person, shall be subject . . . to the death penalty . . . if the jury shall in its discretion so direct, *or, in the case of a plea of guilty, if the court in its discretion shall so order.*" 62 Stat. 794 (1948), 18 U. S. C. § 1992 (emphasis added). And in a statute prohibiting the destruction of aircraft, Congress provided that violators whose conduct causes death "shall be subject . . . to the death penalty . . . if the jury shall in its discretion so direct, *or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion shall so order.*" 70 Stat. 540 (1956), 18 U. S. C. § 34 (emphasis added).

The language of the aircraft-wrecking statute, 18 U. S. C. § 34, is of particular interest here because it reflects a congressional

that the failure of Congress to do so here was wholly inadvertent, it would hardly be the province of the courts to fashion a remedy. Any attempt to do so would be fraught with the gravest difficulties: If a special jury were convened to recommend a sentence, how would the penalty hearing proceed? What would each side be required to show? What standard of proof would govern? To what extent would conventional rules of evidence be abrogated? What privileges would the accused enjoy? Congress, unlike the state legislatures that have authorized jury proceedings to determine the penalty in capital cases,[16] has addressed itself to none of these questions.[17]

---

awareness of the precise problem the Government suggests Congress overlooked in the kidnaping area: In a letter addressed to the Chairman of the House Committee on Interstate and Foreign Commerce, William P. Rogers, then Deputy Attorney General, suggested on behalf of the Justice Department that the bill then under consideration should be amended by the addition of the phrase "or in the case of a plea of not guilty where the defendant has waived trial by jury." The letter stated:

"Under the present phraseology it is doubtful whether the court could invoke the death penalty in a situation where the defendant has entered a plea of not guilty, waived his right to a trial by jury, and asked to be tried by the court." 2 U. S. Code Congressional and Administrative News, 84th Cong., 2d Sess., 3149–3150 (1956). Congress inserted the suggested language in the aircraft statute as enacted on July 14, 1956. Less than a month later, Congress reconsidered the Kidnaping Act and added a technical amendment, 70 Stat. 1043 (1956), but included no provision to authorize the imposition of the death penalty upon defendants who plead guilty or waive the right to jury trial.

[16] See Cal. Penal Code § 190.1 (Supp. 1966); Conn. Gen. Stat. Rev. § 53–10 (Supp. 1965); Pa. Stat. Ann., Tit. 18, § 4701 (1963); N. Y. Penal Law §§ 125.30, 125.35 (1967).

[17] The complex problems presented by separate penalty proceedings have frequently been noted. See, *e. g.*, *Frady* v. *United States*, 121 U. S. App. D. C. 78, 109–110, 348 F. 2d 84, 115–116 (Burger, J., concurring in part and dissenting in part); Note, The California Penalty Trial, 52 Calif. L. Rev. 386 (1964); Note, The Two-Trial

It is one thing to fill a minor gap in a statute—to extrapolate from its general design details that were inadvertently omitted. It is quite another thing to create from whole cloth a complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality. We recognize that trial judges sitting in federal kidnaping cases have on occasion chosen the latter course, attempting to fashion on an *ad hoc* basis the ground rules for penalty proceedings before a jury.[18] We do not know what kinds of rules particular federal judges have adopted, how widely such rules have varied, or how fairly they have been applied. But one thing at least is clear: Individuals forced to defend their lives in proceedings tailor-made for the occasion must do so without the guidance that defendants ordinarily find in a body of procedural and evidentiary rules spelled out in advance of trial.[19] The Government notes with approval

---

System in Capital Cases, 39 N. Y. U. L. Rev. 50 (1964). See also Kuh, A Prosecutor Considers the Model Penal Code, 63 Col. L. Rev. 608, 615 (1963). It is not surprising that courts confronted with such problems have concluded that their solution requires "comprehensive legislative and not piecemeal judicial action." *State* v. *Mount,* 30 N. J. 195, 224, 152 A. 2d 343, 358 (concurring opinion). See also *People* v. *Friend,* 47 Cal. 2d 749, 763, 306 P. 2d 463, 471, n. 7. But see *United States* v. *Curry,* 358 F. 2d 904, 914–915.

[18] The Government informs us that at least three of the defendants who pleaded guilty in cases arising under the Federal Kidnaping Act have been sentenced to death on the recommendation of special penalty juries convened to determine punishment.

[19] Even in States with legislatively established jury proceedings on the penalty issue, defense attorneys have not always been prepared to take advantage of those features of the penalty trial designed to benefit their clients. See Note, Executive Clemency in Capital Cases, 39 N. Y. U. L. Rev. 136, 167 (1964). If the relative novelty of penalty proceedings has thus impaired effective representation in jurisdictions where the contours of such proceedings have been fixed by statute, it seems clear that the difficulties for the defense would be even more formidable under the amorphous

"the decisional trend which has sought . . . to place the most humane construction on capital legislation." Yet it asks us to extend the capital punishment provision of the Federal Kidnaping Act in a new and uncharted direction, without the compulsion of a legislative mandate and without the benefit of legislative guidance. That we decline to do.

## II.

Under the Federal Kidnaping Act, therefore, the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die. Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert the right to contest their guilt before a jury. The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty [20] and to deter exercise of the Sixth Amendment right to demand a jury trial. If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional. But, as the Government notes, limiting the death penalty to cases where the jury recommends its imposition does have another objective: It avoids the more drastic alternative of man-

---

case-by-case system that the Government asks us to legitimize today. It is no wonder that the Second Circuit, while not foreclosing two-stage trials altogether, was "loath to compel unwilling defendants to submit" to them. *United States* v. *Curry*, 358 F. 2d 904, 914.

[20] It is established that due process forbids convicting a defendant on the basis of a coerced guilty plea. See, *e. g., Herman* v. *Claudy*, 350 U. S. 116.

datory capital punishment in every case. In this sense, the selective death penalty procedure established by the Federal Kidnaping Act may be viewed as ameliorating the severity of the more extreme punishment that Congress might have wished to provide.[21]

The Government suggests that, because the Act thus operates "to mitigate the severity of punishment," it is irrelevant that it "may have the incidental effect of inducing defendants not to contest in full measure." [22] We cannot agree. Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. Cf. *United States* v. *Robel,* 389 U. S. 258; *Shelton* v. *Tucker,* 364 U. S. 479, 488–489. The question is not whether the chilling effect is "incidental" rather than intentional; the question is whether that effect is unnecessary and therefore excessive. In this case the answer to that question is clear. The Congress can of course mitigate the severity of capital punishment. The goal of limiting the death penalty to cases in which a jury recommends it is an entirely legitimate one. But that goal can be achieved without penalizing those defendants who plead not guilty and demand jury trial. In some States, for example, the choice between life imprisonment and capital punishment is left to a jury in *every* case— regardless of how the defendant's guilt has been determined.[23] Given the availability of this and other alternatives, it is clear that the selective death penalty provision of the Federal Kidnaping Act cannot be justi-

---

[21] See *United States* v. *Curry,* 358 F. 2d 904, 913–914 and n. 8. See also *Andres* v. *United States,* 333 U. S. 740, 753–754 (Frankfurter, J., concurring).

[22] See *McDowell* v. *United States,* 274 F. Supp. 426, 431. See also *Laboy* v. *New Jersey,* 266 F. Supp. 581, 585.

[23] See, *e. g.,* Wash. Rev. Code §§ 9.48.030, 10.01.060, 10.49.010 (1956). Cf. Cal. Penal Code § 190.1 (Supp. 1966).

fied by its ostensible purpose. Whatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right. See *Griffin* v. *California*, 380 U. S. 609.[24]

It is no answer to urge, as does the Government, that federal trial judges may be relied upon to reject coerced pleas of guilty and involuntary waivers of jury trial. For the evil in the federal statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them. A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right. Thus the fact that the Federal Kidnaping Act tends to discourage defendants from insisting upon their innocence and demanding trial by jury hardly implies that every defendant who enters a guilty plea to a charge under the Act does so involuntarily.[25] The power to reject coerced guilty pleas and involuntary jury waivers might alleviate, but it cannot totally eliminate, the constitutional infirmity in the capital punishment provision of the Federal Kidnaping Act.

---

[24] In an opinion by Justice Zenoff, *Spillers* v. *State,* —— Nev. ——, ——, 436 P. 2d 18, 22–23, the Supreme Court of Nevada has recently held unconstitutional a state penalty scheme imposing capital punishment for forcible rape resulting in great bodily injury "if the jury by their verdict affix the death penalty." Nev. Rev. Stat. § 200.360 (1) (1963).

[25] See *Laboy* v. *New Jersey,* 266 F. Supp. 581, 584. So, too, in *Griffin* v. *California,* 380 U. S. 609, the Court held that comment on a defendant's failure to testify imposes an impermissible penalty on the exercise of the right to remain silent at trial. Yet it obviously does not follow that every defendant who ever testified at a pre-*Griffin* trial in a State where the prosecution could have commented upon his failure to do so is entitled to automatic release upon the theory that his testimony must be regarded as compelled.

The Government alternatively proposes that this Court, in the exercise of its supervisory powers, should simply instruct federal judges sitting in kidnaping cases to reject all attempts to waive jury trial and all efforts to plead guilty, however voluntary and well-informed such attempted waivers and pleas might be. In that way, we could assure that every defendant charged in a federal court with aggravated kidnaping would face a possible death penalty, and that no defendant tried under the federal statute would be induced to forgo a constitutional right. But of course the inevitable consequence of this "solution" would be to force all defendants to submit to trial, however clear their guilt and however strong their desire to acknowledge it in order to spare themselves and their families the spectacle and expense of protracted courtroom proceedings. It is true that a defendant has no constitutional right to insist that he be tried by a judge rather than a jury, *Singer* v. *United States,* 380 U. S. 24, and it is also true "that a criminal defendant has [no] absolute right to have his guilty plea accepted by the court." *Lynch* v. *Overholser,* 369 U. S. 705, 719. But the fact that jury waivers and guilty pleas may occasionally be rejected hardly implies that all defendants may be required to submit to a full-dress jury trial as a matter of course. Quite apart from the cruel impact of such a requirement upon those defendants who would greatly prefer not to contest their guilt, it is clear—as even the Government recognizes—that the automatic rejection of all guilty pleas "would rob the criminal process of much of its flexibility." As one federal court has observed: [26]

"The power of a court to accept a plea of guilty is traditional and fundamental. Its existence is necessary for the . . . practical . . . administration

[26] *United States* v. *Willis,* 75 F. Supp. 628, 630.

of the criminal law. Consequently, it should require an unambiguous expression on the part of the Congress to withhold this authority in specified cases."

If any such approach should be inaugurated in the administration of a federal criminal statute, we conclude that the impetus must come from Congress, not from this Court. The capital punishment provision of the Federal Kidnaping Act cannot be saved by judicial reconstruction.

### III.

The remaining question is whether the statute as a whole must fall simply because its death penalty clause is constitutionally deficient. The District Court evidently assumed that it must, for that court dismissed the kidnaping indictment. We disagree. As we said in *Champlin Rfg. Co.* v. *Commission,* 286 U. S. 210, 234:

> "The unconstitutionality of a part of an Act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." [27]

---

[27] The appellees correctly note that *Champlin* was a case where Congress had included a clause expressly authorizing the severance of any invalid provision, a fact upon which this Court relied in recognizing "a presumption that, eliminating invalid parts, the legislature would have been satisfied with what remained . . . ." 286 U. S. 210, 235. But whatever relevance such an explicit clause might have in creating a presumption of severability, see *Electric Bond Co.* v. *Comm'n,* 303 U. S. 419, 434, the ultimate determination of severability will rarely turn on the presence or absence of such a clause. Thus, for example, the Court in *Champlin,* after stating the basic test quoted above, cited cases in which invalid statutory provisions had been severed despite the absence of any provision for severability. *Pollock* v. *Farmers' Loan & Trust Co.,* 158 U. S.

586

Under this test, it is clear that the clause authorizing capital punishment is severable from the remainder of the kidnaping statute and that the unconstitutionality of that clause does not require the defeat of the law as a whole. See *McDowell* v. *United States,* 274 F. Supp. 426, 429. Cf. *Spillers* v. *State,* —— Nev. ——, ——, 436 P. 2d 18, 23–24.

The clause in question is a functionally independent part of the Federal Kidnaping Act. Its elimination in no way alters the substantive reach of the statute and leaves completely unchanged its basic operation. Under such circumstances, it is quite inconceivable that the Congress which decided to authorize capital punishment in aggravated kidnaping cases would have chosen to discard the entire statute if informed that it could not include the death penalty clause now before us.[28]

In this case it happens that history confirms what common sense alone would suggest: The law as originally enacted in 1932 contained no capital punishment provision.[29] A majority of the House had favored the

601, 635; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 395–396; *Field* v. *Clark,* 143 U. S. 649, 695–696.

[28] As this Court observed in *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 396, "it is not to be presumed that the legislature was legislating for the mere sake of imposing penalties, but the penalties . . . were simply in aid of the main purpose of the statute. They may fail, and still the great body of the statute have operative force, and the force contemplated by the legislature in its enactment."

[29] The original Federal Kidnaping Act, 47 Stat. 326, provided:

"That whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward shall, upon conviction, be punished by imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine . . . ."

death penalty but had yielded to opposition in the Senate as a matter of expediency.[30]  Only one Congressman had expressed the view that the law would not be worth enacting without capital punishment.[31]  The majority obviously felt otherwise.[32]  When the death penalty was added in 1934, the statute was left substantially un-

---

[30] The Senate Judiciary Committee had opposed capital punishment and had reported the kidnaping law in a version that authorized no penalty beyond "imprisonment . . . for such term of years as the court, in its discretion, shall determine." S. Rep. No. 765, 72d Cong., 1st Sess., 2 (1932); 75 Cong. Rec. 11878 (1932). In the ensuing debates, some members of the House opposed the death penalty on principle. 75 Cong. Rec. 13285, 13289–13290, 13294 (1932). Others argued that the threat of capital punishment would encourage kidnapers to kill their victims lest their testimony lead to conviction and execution. Id., at 13285, 13304. Most favored the death penalty in some form, see id., at 13283–13284, 13286–13287, 13295, but feared that efforts to persuade the Senate to accept a capital punishment provision would occasion further delay and might cause ultimate defeat. Id., at 13288, 13299, 13303. The majority therefore compromised their views and accepted the Senate version of the bill. Id., at 13304. See Bomar, The Lindbergh Law, 1 Law & Contemp. Prob. 435, 440 (1934).

[31] Congressman Dyer of Missouri had stated that without the death penalty "the legislation would not be worth anything, because every State now has a kidnaping law and few of them provide the death penalty." 75 Cong. Rec. 13287 (1932).

[32] Congressman Cochran of Missouri, who had introduced the original bill (H. R. 5657) with a death penalty clause, stressed that his objective was the prompt enactment of a federal kidnaping law; to that end, he was "willing to go along and strike out the death penalty." 75 Cong. Rec. 13296 (1932); see also id., at 13284, 13299, 13304. Congressman LaGuardia of New York put the matter succinctly: "[I]f what Congress is looking for is a headline, leave the death penalty in; but if we are looking for a real bill that will be a deterrent to kidnaping, take the Senate bill. [Applause.]" Id., at 13299. Shortly thereafter, the House passed the Senate version of the Act. Id., at 13304.

changed in every other respect.[33] The basic problem that had prompted enactment of the law in 1932—the difficulty of relying upon state and local authorities to

---

[33] By 1934, the Senate's attitude toward capital punishment had changed markedly. In that year the Senate passed a bill (S. 2841) authorizing punishment "by imprisonment for not less than 10 years, or by death" for killing or kidnaping in connection with a bank robbery. 78 Cong. Rec. 5738 (1934). The House Judiciary Committee amended the Senate provision to its present form, see 18 U. S. C. § 2113 (e), limiting the death penalty to those cases where "the verdict of the jury shall so direct." H. R. Rep. No. 1461, 73d Cong., 2d Sess., 1 (1934).

The House Judiciary Committee had not forgotten that its attempt to include similar language in the Kidnaping Act of 1932, see H. R. Rep. No. 1493, 72d Cong., 1st Sess., 1 (1932), had been defeated "in the rush to draft and enact a [kidnaping] bill suitable to both houses before adjournment." Finley, The Lindbergh Law, 28 Geo. L. J. 908, 914, n. 24 (1940). Taking its cue from the bank robbery legislation, the House Committee found an ideal opportunity to reassert its 1932 position in a Senate bill (S. 2252) that had begun as a technical amendment to the 1932 Kidnaping Act. See 78 Cong. Rec. 5737 (1934). In S. 2252, the Senate retained the basic punishment of "imprisonment in the penitentiary for such term of years as the court, in its discretion, shall determine," see n. 29, *supra*, but the House Judiciary Committee added the alternative penalty of "death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed . . . ." H. R. Rep. No. 1457, 73d Cong., 2d Sess., 1 (1934); 78 Cong. Rec. 8127–8128 (1934).

After initial disagreement in the Senate, *id.*, at 8263–8264, and a conference, *id.*, at 8322; H. R. Rep. No. 1595, 73d Cong., 2d Sess. (1934), the Senate accepted the House addition to S. 2252 without debate, 78 Cong. Rec. 8767, 8775, 8778, 8855–8857 (1934), and the resulting statute, 48 Stat. 781 (1934), employed substantially the same language as that now appearing in 18 U. S. C. § 1201 (a). As amended in 1934, the Federal Kidnaping Act, 48 Stat. 781, thus provided:

"Whoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled,

investigate and prosecute interstate kidnaping [34]—had not vanished during the intervening two years. It is therefore clear that Congress would have made interstate kidnaping a federal crime even if the death penalty provision had been ruled out from the beginning. It would be difficult to imagine a more compelling case for severability.

In an effort to suggest the contrary, the appellees insist that the 1934 amendment "did not merely increase the penalties for kidnaping; it changed the whole thrust of the Act." They note that Congress deliberately lim-

---

decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine . . . ."

[34] In late 1931 the American public became seriously concerned about the mounting incidence of professional kidnaping and the apparent inability of state and local authorities to cope with the interstate aspects of the problem. See Fisher & McGuire, Kidnapping and the So-Called Lindbergh Law, 12 N. Y. U. L. Q. Rev. 646, 652–653 (1935). Because of its geographical position, the city of St. Louis "had experienced numerous kidnapings in which the handicap of state lines had hindered or defeated her police officers." Bomar, The Lindbergh Law, 1 Law & Contemp. Prob. 435 (1934). Largely in response to this experience, Senator Patterson and Congressman Cochran, both of Missouri, introduced identical bills (S. 1525, H. R. 5657) in the House and Senate, 75 Cong. Rec. 275, 491 (1931), forbidding the transportation in interstate or foreign commerce of any person "kidnaped . . . and held for ransom or reward, or . . . for any other unlawful purpose." Several months after the kidnaping of the Lindbergh baby in March 1932, Congress enacted the first Federal Kidnaping Act, see n. 29, *supra,* a slightly modified version of the bills introduced by Patterson and Cochran.

ited capital punishment to those kidnapers whose victims are not liberated unharmed. Such a differential penalty provision, the appellees argue, is needed to discourage kidnapers from injuring those whom they abduct.[35] The appellees contend that, without its capital punishment clause, the Federal Kidnaping Act would not distinguish "the penalties applicable to those who do and those who do not harm or kill their victims." Stressing the obvious congressional concern for the victim's safety, they conclude that "it is doubtful that Congress would intend for the statute to stand absent such a feature." This argument is wrong as a matter of history, for Congress *enacted* the statute "absent such a feature."[36] It is

[35] See Bomar, The Lindbergh Law, 1 Law & Contemp. Prob. 435, 440 and n. 36. One might legitimately doubt the ability of the death penalty clause to achieve this supposed objective. In that regard, it has been observed that "[t]he advantage to the kidnapper in killing his victim is obvious and immediate, for the [Government's] best witness, perhaps its whole case, will be put out of the way. Thus a sentence of life imprisonment instead of death may not suffice to induce a kidnapper to refrain from killing his victim, even if the kidnapper is aware of the mitigation provision—itself a supposition not always true." Note, A Rationale of the Law of Kidnapping, 53 Col. L. Rev. 540, 550 (1953).

Moreover, as this Court has interpreted the statute, the death penalty may be imposed so long as "the kidnapped person . . . was still suffering from . . . injuries when liberated." *Robinson* v. *United States,* 324 U. S. 282, 285. As a result, "[o]nce [an] injury has taken place, the inducement held out by the statute necessarily is either to hold the victim until cure is effected or to do away with him so that evidence, both of the injury and of the kidnapping, is destroyed." *Id.,* at 289 (Rutledge, J., dissenting).

[36] Congress was certainly aware when it passed the original Kidnaping Act of 1932 that "[t]he victim may be murdered or slain" if the kidnaper "has nothing to gain by [keeping] the victim . . . alive." 75 Cong. Rec. 13285 (1932). Such considerations might have been influential in the omission of any death penalty provision in 1932, see *Robinson* v. *United States,* 324 U. S. 282, 289, n. 4 (Rutledge, J., dissenting), but not a single member of Congress

wrong as a matter of fact, for the length of imprisonment imposed under the Act can obviously be made to reflect the kidnaper's treatment of his victim. And it is wrong as a matter of logic, for nothing could more completely obliterate the distinction between "the penalties applicable to those who do and those who do not harm or kill their victims" than the total invalidation of *all* the penalties provided by the Federal Kidnaping Act—the precise result sought by the appellees.

Thus the infirmity of the death penalty clause does not require the total frustration of Congress' basic purpose—that of making interstate kidnaping a federal crime. By holding the death penalty clause of the Federal Kidnaping Act unenforceable, we leave the statute an operative whole, free of any constitutional objection. The appellees may be prosecuted for violating the Act, but they cannot be put to death under its authority.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Marshall took no part in the consideration or decision of this case.

Mr. Justice White, with whom Mr. Justice Black joins, dissenting.

The Court strikes down a provision of the Federal Kidnaping Act which authorizes only the jury to impose the death penalty. No question is raised about the death penalty itself or about the propriety of jury participation in its imposition, but confining the power to impose the death penalty to the jury alone is held to

---

even hinted that the anti-kidnaping law should be defeated altogether in the interest of the victim's safety. Given the law's fundamental objective of preventing interstate kidnaping in the first instance, any such suggestion would have been unthinkable.

burden impermissibly the right to a jury trial because it may either coerce or encourage persons to plead guilty or to waive a jury and be tried by the judge. In my view, however, if the vice of the provision is that it may interfere with the free choice of the defendant to have his guilt or innocence determined by a jury, the Court needlessly invalidates a major portion of an Act of Congress. The Court itself says that not every plea of guilty or waiver of jury trial would be influenced by the power of the jury to impose the death penalty. If this is so, I would not hold the provision unconstitutional but would reverse the judgment, making it clear that pleas of guilty and waivers of jury trial should be carefully examined before they are accepted, in order to make sure that they have been neither coerced nor encouraged by the death penalty power in the jury.

Because this statute may be properly interpreted so as to avoid constitutional questions, I would not take the first step toward invalidation of statutes on their face because they arguably burden the right to jury trial.