23 F.3d 403
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Terry BARNES, Defendant-Appellant.
 No. 93-5383.
 United States Court of Appeals, Fourth Circuit.
 Argued March 10, 1994
Decided April 11, 1994.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Fayetteville. W. Earl Britt, District Judge, (CR-92-58-3)
 John A. Dusenbury, Jr., Assistant Federal Public Defender, Raleigh, NC, for appellant.
 John S. Bowler, Assistant U.S. Atty., United States Attorney's Office, Raleigh, NC, for appellee.
 James R. Dedrick, U.S. Atty., William D. Delahoyde, Asst. U.S. Atty., Curtis E. Bostic, Third Year Law Student, Raleigh, NC, for appellee.
 E.D.N.C.
 AFFIRMED.
 Before PHILLIPS and HAMILTON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Terry Barnes was originally indicted for the September 1, 1992 armed robbery of First National Savings Bank in Clinton, North Carolina, and for using a firearm during a crime of violence. Thereafter, the grand jury returned a superseding indictment which contained an additional count of armed robbery of First Citizens Bank and Trust Company in Roseboro, North Carolina on August 7, 1992. Prior to trial, appellant moved to dismiss the superseding indictment on grounds of prosecutorial vindictiveness. This motion was denied and on February 11, 1993, Barnes was convicted of armed robbery of the bank in Clinton and of the use of a firearm in connection therewith. He was acquitted of the Roseboro robbery.
 
 
 2
 Appellant claims that the district court erred (1) in denying his motion to dismiss the indictment because of prosecutorial vindictiveness, (2) in preventing his expert fingerprint examiner from testifying that Barnes was a "secretor," and (3) in excluding Barnes' proffer of demonstrative evidence of mistaken "look alike" photographs.
 
 
 3
 We find no merit in any of these exceptions, and we affirm.
 
 I.
 
 4
 On Friday, August 7, 1992, at approximately 3:45 p.m., a lone black male wearing blue coveralls, a black stocking mask and carrying a long gun entered the First Citizens Bank and Trust Company in Roseboro, North Carolina. He jumped over the security gate and into the tellers' area, where he pointed his gun at two female tellers and told them to get down. He cleaned out the cash drawers and moved the tellers into a back room. He then left the bank. It was later determined that he had taken between $5,000 and $6,000.
 
 
 5
 A woman working at a dry cleaners immediately across the street from the bank identified Barnes as a man she had seen wearing blue coveralls in front of her store at about the time of the robbery. At approximately 4:00 p.m. on the same day, a pair of new blue coveralls was found lying on the pavement on Highway 24, approximately three and a half miles west of Roseboro. These coveralls were delivered to the Roseboro police station after the finder heard that they fit the description of the coveralls worn by the robber. These coveralls had a distinctive orange patch on the rear pocket with the trademark "Big Ben."
 
 
 6
 Roseboro is approximately eleven miles from Clinton, North Carolina. On September 1, 1992 at approximately 1:20 p.m., a black male wearing blue coveralls, a black stocking mask and carrying a long gun entered the First American Savings Bank in Clinton, aimed his gun at the bank tellers and a customer and instructed them to get down. The robber vaulted the bank counter and had one of the tellers place currency in a bag he presented. He then directed the tellers into a rear closet and advised them to stay there. One of the tellers noticed that his coveralls bore an orange patch on the rear pocket with the trademark "Big Ben" thereon.
 
 
 7
 A surveillance camera at the bank was activated when one of the tellers removed the bait money from the cash drawer, and pictures were taken during the robbery. Immediately before leaving the bank, the bank robber removed his stocking mask as he crossed in front of one of the surveillance cameras and several clear pictures of his face were taken.
 
 
 8
 The robbery was investigated by the Clinton police and the FBI. A latent shoe print was developed on top of one of the teller counters in the space the robber had vaulted, and a latent palm print was found in the same area.
 
 
 9
 Police officers recognized the photographs as someone known as "Terry" who worked at a local swimming pool. These photos were shown to Barnes' employer, a coworker, and his parole officer, and all identified the person in the photographs as Terry Barnes.
 
 
 10
 The next morning Barnes was arrested as he drove to work. Following his arrest, search warrants were obtained for his residence and automobile and a pair of tennis shoes was seized from his automobile together with a cellophane package which bore a white label with numbers on it. The Clinton police determined that the cellophane probably came from a package of black panty hose, and they purchased a pair of such hose from a Clinton department store. These panty hose were similar to those worn as a mask by the robber at the time of the robbery of each bank. The cellophane package containing the panty hose was identical to the cellophane seized from Barnes' automobile.
 
 
 11
 Investigators also learned that Barnes had worked at Coharie Farms, a large farm located outside Clinton. Coharie Farms provided blue coveralls to its employees and these coveralls contained the orange patch and the trademark "Big Ben."
 
 
 12
 FBI agents testified that the latent shoe print found on the counter matched the print of Barnes' shoe in all respects.
 
 
 13
 During trial, reprints and enlargements of the bank surveillance photographs were put into evidence and the jury had the opportunity to compare the defendant with the surveillance photographs.
 
 
 14
 Appellant offered evidence of misidentification. Two witnesses testified that a person similar in appearance to Barnes was seen following the bank robbery at two different locations in Clinton, but neither person was actually Barnes. Barnes also offered Heyward Starling as an expert in fingerprint identification. The appellant wished to show that if he had vaulted over the counter and into the teller area, he should have left some fingerprints on the counter. He also wished to have Mr. Starling testify that appellant was a "secretor" and therefore it was more probable that his prints would have been found on the counter. The government objected to the testimony that the appellant was a "secretor" and after a voir dire examination of the witness, the court sustained the objection and found that the witness was not qualified as an expert in physiology or anatomy and the proffered testimony did not fall within his field of expertise. The court also found that the testimony was speculative.
 
 
 15
 Barnes also proffered evidence of a bank surveillance photograph taken during a robbery in July 1992 at a Fayetteville bank. This was a photograph of a person wearing a disguise including a baseball cap pulled down over his face, sunglasses and a mustache. An investigator for the Fayetteville Police Department would have testified that the photograph looked like one Chuck Livingston, if Livingston had been wearing a baseball cap and sunglasses. Livingston was proffered to say that the photograph was not him. The court sustained an objection to the proffered testimony of Bloomfield and Livingston on the ground that it was irrelevant.
 
 
 16
 Barnes was convicted of the Clinton robbery and the use of a firearm in connection therewith, and he now appeals.
 
 II.
 
 17
 Subsequent to the first indictment, appellant's attorney and an assistant United States attorney discussed the possibility of a plea agreement, but appellant would not agree to plead to either count in the original indictment. Thereafter, the government attorney advised defense counsel that if Barnes persisted in going to trial on the Clinton bank robbery, the government would seek a superseding indictment charging him with the Roseboro robbery. When plea negotiations reached an impasse, the government obtained a superseding indictment. Appellant argues that this was the result of improper prosecutorial motive and the application of unconstitutional leverage by a prosecutor in an effort to deprive a defendant of his constitutional right to a trial by a jury. Appellant argues that his case is particularly appealing because the evidence connecting him with the Roseboro robbery was quite thin, and he was eventually acquitted on this charge.
 
 
 18
 The appellant's arguments have all been answered by the Supreme Court. In Blackledge v. Allison, 431 U.S. 63, 71 (1977), the court approved the practice of plea negotiations stating,"[w]hatever might be the situation in an ideal world, the fact is that the guilty plea and the often concomitant plea bargain are important components of this country's criminal justice system. Properly administered, they can benefit all concerned."
 
 
 19
 The present facts are similar to those in Bordenkircher v. Hayes, 434 U.S. 357 (1978), in which the court stated:
 
 
 20
 It may be helpful to clarify at the outset the nature of the issue in this case. While the prosecutor did not actually obtain the recidivist indictment until after the plea conferences had ended, his intention to do so was clearly expressed at the outset of the plea negotiations. Hayes was thus fully informed of the true terms of the offer when he made his decision to plead not guilty. This is not a situation, therefore, where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating to the original indictment had ended with the defendant's insistence on pleading not guilty.
 
 
 21
 Id. at 360 (footnote omitted).
 
 
 22
 The government's negotiations with Barnes' attorney followed this same scenario. Barnes, through his attorney, was aware that if he did not reach a plea agreement as to the first indictment, the government would seek a supplemental indictment which would contain an additional bank robbery count. In Bordenkircher, the court explained that hard plea bargaining on the part of the government does not violate a defendant's due process rights:
 
 
 23
 To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, see North Carolina v. Pearce, supra, at 738 (opinion by Black, J.), and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is "patently unconstitutional." Chaffin v. Stynchcombe, supra, at 32-33, n. 20. See United States v. Jackson, 390 U.S. 570. But in the "give-and-take" of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.
 
 
 24
 Plea bargaining flows from "the mutuality of advantage" to defendants and prosecutors, each with his own reasons for wanting to avoid trial. Brady v. United States, supra, at 752. Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. 397 U.S. at 758. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial. See ABA Project on Standards for Criminal Justice, Pleas of Guilty Sec. 3.1 (App. Draft 1968); Note, Plea Bargaining and the Transformation of the Criminal Process, 90 Harv. L. Rev. 564 (1977). Cf. Brady v. United States, supra, at 751; North Carolina v. Alford, 400 U. S. 25.
 
 
 25
 While confronting a defendant with the risk of more severe punishment clearly may have a "discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable"--and permissible--"attribute of any legitimate system which tolerates and encourages the negotiation of pleas." Chaffin v. Stynchcombe, supra, at 31. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty.
 
 
 26
 434 U.S. at 363-64.
 
 
 27
 Although the evidence against Barnes was not as strong in the Roseboro count, it was sufficient to support the grand jury's finding of probable cause. The modus operandi was strikingly similar and the circumstantial evidence quite strong. Of course, the government did not have the surveillance photograph at the Roseboro bank but we find no evidence of prosecutorial vindictiveness in the application and obtaining of the superseding indictment.
 
 III.
 
 28
 We find no merit to the claim that the trial judge abused his discretion in excluding the testimony of the expert in fingerprint identification when the expert was asked for an opinion as to whether or not the appellant was a "secretor." The court found that the witness had not been qualified as an expert in this field, and from a review of the record we find no abuse of discretion. The witness testified that he had never been asked to testify as an expert as to whether an individual was or was not a "secretor." He also testified that whether a person was a "secretor" made no substantive difference as to whether he might leave a latent print. A trial judge has broad discretion in determining the admission or exclusion of expert evidence, and the court's action is sustained unless manifestly erroneous. Salem v. United States Lines Co., 370 U.S. 31, 35 (1962) (citation omitted).
 
 IV.
 
 29
 We find no abuse of discretion in the trial judge's refusal to allow the testimony proffered by the witnesses Bloomfield and Livingston. The court found that this testimony was irrelevant, and we agree. The jury had the benefit of the surveillance photographs and of the appellant's presence in the courtroom. The jury could make its comparisons of the appellant with the photographs, and arrive at a conclusion without being confused by the proffered testimony that a person not in any way connected with the trial did or did not look like another individual, when such person was wearing a disguise.
 
 
 30
 For the reasons set forth herein, we affirm.
 
 AFFIRMED