**Carl Edward BURTON, Petitioner-Appellant,**

v.

**UNITED STATES of America, Respondent-Appellee.**

No. 19575.

United States Court of Appeals, Sixth Circuit.

Feb. 25, 1971.

Carl Edward Burton, in pro. per.

George J. Long, U. S. Atty., Kenneth J. Tuggle, Asst. U. S. Atty., Louisville, Ky., for appellee.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

O'SULLIVAN, Senior Circuit Judge.

Carl Edward Burton appeals from denial of his Section 2255 petition which sought vacation of a life sentence im-

posed on him in 1958 upon his plea of guilty to violation of 18 U.S.C. § 1201(a) —interstate transportation of a kidnapped person. The sentence was imposed on March 12, 1958, in the United States District Court for the Western District of Kentucky, Louisville Division. Burton asks vacation of his sentence upon his now assertion that fear that a jury would impose a death sentence if he stood trial, coerced him to enter a plea of guilty. This ground for relief was first asserted in July 1968, ten years after he was sentenced and immediately after the Supreme Court decision in United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). There the Court struck down as unconstitutional the provision in § 1201(a) (1) which permitted a jury to impose a death penalty when a kidnap victim was not returned unharmed.

The kidnapping involved in this case was an exciting and dramatic affair. In his many addresses to us, and in the District Court, petitioner makes no suggestion that he is not guilty; neither is there any intimation that the conduct of the officers who apprehended him and brought about his conviction upon his own plea was otherwise than eminently fair. We set out a description of the criminal conduct of appellant. It derives from the colloquy which was had at the time of Burton's arraignment and plea, and from undenied recitals of the government's brief to us.

On February 1, 1958, Burton and one Davis, both of whom had criminal backgrounds, were stopped by a Missouri state trooper and a local sheriff's officer, at or near the small community of Van Buren, Missouri. They had been driving a 1935 automobile. They were asked some questions about a pistol then in their possession, and upon the officers' observation of a sawed-off shotgun in the vehicle, Burton and Davis were requested to get out of the car. They did so, but at gunpoint seized the Missouri State Trooper and the other officer. All of this was observed by some six or more persons who were in a gas station close by. Burton and Davis first considered seizing a woman from that group to carry away as a hostage. They decided, however, to take the state trooper instead. He was placed, and carried away in, the Missouri State Police car. The police radio was employed to warn listeners to keep away from the seized car if they valued the life of the captive trooper. Burton, Davis and their captive proceeded through Cairo, Illinois, and on to Paducah, Kentucky. Police vehicles began pursuit and there was an exchange of gunfire, with shots being fired at police out of the back window of the seized police vehicle. Paducah was Burton's home city and from his knowledge of it, he managed to evade the police in the pursuing vehicles and those waiting in Paducah. He proceeded into the country where Burton, Davis and their captive took refuge in a farm house "and a house and its occupants [the Sheltons] were taken over." Thereafter there were broadcasts every fifteen minutes urging Burton and Davis to surrender and advising them of the consequences of injury to the captive state trooper. Eventually Burton left the Shelton farm and surrendered. The farmer and his wife and the trooper were liberated unharmed. On February 5, 1968, following his appearance before a United States Commissioner, and after being advised of his rights, Burton gave FBI agents a signed, eleven page statement detailing the events above referred to. During the course of the arraignment colloquy, Burton interrupted the United States Attorney's recital of the facts of the crime to correct some inaccuracies in such recital.

None of the foregoing is challenged in Burton's brief to this Court nor in the motion to vacate sentence which initiated the case before us. At the start of the arraignment, the District Judge appointed counsel for Burton and Davis—one W. S. Shumate, a member of the Louisville, Kentucky, bar. The transcript of the arraignment recites that a confer-

ence ensued between Burton, Davis and their appointed counsel. Thereafter, the attorney announced defendants' readiness to proceed. During the colloquy which followed, the statute—Section 1201, Title 18—was read, including the statement that punishment could be "by death if the kidnapped person has not been liberated unharmed." There was no claim, however, that the kidnap victim had not been liberated unharmed; neither did the indictment, which charged violation of § 1201, aver that "the kidnapped person had not been liberated unharmed." Burton and Davis had received a copy of the indictment before they were arraigned. Upon inquiry by the District Judge and the United States Attorney as to whether the penalties had been explained, the appointed attorney stated that "I don't think I mentioned the penalty." Thereupon the United States Attorney said to the defendants:

"That you may receive a sentence of any number of years or life, in the discretion of the Court, upon a plea of guilty on Count 1 [the kidnap charge] and as to Count 2 [automobile theft] that the penalty is a fine of not more than $5,000 or imprisonment of five years or both. You do understand? That has been explained?

"Mr. Burton: You've just explained it.

"Mr. Shumate: I didn't explain that to them. You've just mentioned it."

Thus, the possibility of a death sentence, should he choose to stand trial, was not before Burton when he entered his guilty plea. The foregoing quote likewise challenges the truth of Burton's 1968 assertion that his appointed attorney had, in conference, told him that if he stood trial a jury could impose the death penalty, and that because a state trooper was involved the government would likely press for such a verdict.

Burton's first attack upon his sentence, made in the year 1962, contained no such claim. It charged only that he was denied the effective assistance of counsel and that the District Judge had failed to determine that his plea had been voluntarily entered. That motion was denied by the District Court and such denial was affirmed on his appeal to this Court.

The motion which, on July 26, 1968, began this proceeding, recited that:

"On March 12, 1958, Petitioner was arraigned on the aforesaid indictment. At arraignment, Mr. W. L. Shumate, attorney at law was appointed by the court to represent petitioner and co-defendant as well. A short recess was granted for counsel and defendants to confer. Upon returning to the courtroom, formal arraignment was waived, *the court explained the charge and the maximum penalty to petitioner on Count I and Count II*. The court then sentenced petitioner to life imprisonment on Count I of the indictment, and five years on Count II, to run concurrently with Count I." (Emphasis supplied.)

and the style of his claim for relief was that:

"The petitioner's plea of guilty to count one of the indictment on March 11, 1958, was not voluntarily entered, but was the product of coercion, inasmuch as petitioner was in fear that if he pled not guilty before a jury, he might lose his life."

He went on then to assert his reliance on United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), as invalidating his plea of guilty, and on Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), as justifying his renewed attack after "an intervening change in the law."

Burton's initial motion in the proceeding here involved was first overruled by District Court order; this order was later withdrawn and further consideration given to the matter; on October 11, 1968, the District Judge entered an order granting Burton's motion upon the authority of *Jackson* and Amsler v. United States, 381 F.2d 37 (9th Cir. 1967), stating "this Court finds that 'there was the possibility of a death penalty under

the indictment.'" Thereafter, upon a government motion to withdraw the last mentioned order, the matter was further considered. A brief by the Department of Justice emphasized that disaster would follow a retroactive application of *Jackson*, and would release from prisons some 400 criminals under life sentences who might well follow the lead of Burton.

The District Court thereafter concluded that his second order vacating Burton's sentence was improvidently entered and, on April 1, 1969, entered a third order, this time denying Burton's § 2255 motion. While the case was pending on appeal here, and with government consent, we granted Burton's petition that the matter be remanded to allow him to amend his motion. The District Court heard the matter upon Burton's final amended motion and in September 1970 again denied it. This is the order now before us.

We attach as an appendix a transcript of the hearing at which the challenged plea of guilty was entered. In his now address to this court, Burton colorfully claims that "his pleas of guilty were the result of moral torture and that he was finessed by his counsel." As is usual in today's invocation of the Constitution, Burton makes no pretense that he was not guilty of the crime to which he pleaded guilty. As stated above, his first motion for § 2255 relief did not rely on the ground now asserted. However, on July 27, 1968, promptly after the news of the Supreme Court's decision in United States v. Jackson, *supra*, (April 8, 1968) had no doubt circulated in the prisons of the country, Burton began to reconstruct his case to fit the rule of *Jackson*. The first motion, quoted above, contained only a conclusional allegation of coercion, without specification of what facts or circumstances brought about petitioner's fear that if he pleaded not guilty "he might lose his life." In the order from which appeal was first taken, the District Judge, after reference to the colloquy set out in the attached appendix, said:

"In the face of this detailed colloquy between the accused and his accusers concerning the details of the offense charged, we find the petitioner's conclusory and unsupported allegation that his plea was coerced to be without merit. Petitioner has merely set forth conclusions adopted from the Jackson decision without accompanying detailed factual allegations or supporting affidavit concerning the voluntariness of his plea and accordingly is not entitled to either a hearing or relief under § 2255."

Following our remand, appellant's amended Motion to Vacate, filed January 5, 1970, for the first time came up with allegations of the claimed factual circumstances which *coerced* his plea. He said:

"Petitioner's fear of being executed was an impelling influence to his decision to plead guilty. *Petitioner's attorney offered two choices to him.* He could forego trial by jury and live. Or he could plead not guilty, stand trial, *and have the spectre of death sitting in with the jurors. This pale rider had no business in the jury box.*" (Emphasis supplied.)

After these dramatic charges were criticized as conclusional, Burton responded to such criticism by filing an affidavit which, for the first time, accused his appointed attorney, *then deceased*, of being the author of Burton's alleged deprivation of constitutional right. It set out that,

"On March 12, 1958, affiant appeared before the United States District Court, Western District of Kentucky, Louisville, Kentucky, to answer the charge of violating the Federal Kidnapping Statute (18 U.S.C. § 1201); the Honorable Henry L. Brooks, Judge Presiding in Criminal No. 24,997; that on March 12, 1958, this Court appointed Mr. W. S. Shumate, attorney of Louisville, Kentucky, bar, to represent affiant and his co-defendant Harold Wayne Davis; that after Mr. Shumate was appointed to represent affiant he interviewed affiant in the conference

room located in the Federal Courthouse, Louisville, Kentucky; that during the conference, Mr. Shumate informed affiant that the charge he was indicted on carried the penalty of death if the jury so recommends; that if he plead guilty the court could not impose the death penalty; that he (Mr. Shumate) had conferred with the United States Attorney and was told that if affiant insisted on a jury trial that the government would request of the jury to impose the death penalty; that he (Mr. Shumate) told affiant that if he (affiant) insisted on a jury trial and the fact that a police officer was the kidnap victim the jury would in all probability recommend the death sentence; that shortly after this interview with Mr. Shumate affiant entered a plea of guilty and was sentenced to a term of life imprisonment all in less than a thirty minute period after entering the courtroom on March 12, 1958."

In the final order in the District Court— the order before us—the District Judge said, in part:

"Despite petitioner's now repeated allegations that he entered a plea of guilty because he feared he could receive a death sentence after a jury trial, we do not believe petitioner actually had any such fear. At the beginning of the arraignment, Assistant U.S. Attorney Jones informed petitioner and his co-defendant that they could be *sentenced to any number of years or life* on the kidnapping count. Then the Court read the kidnapping statute to petitioner and his co-defendant. These facts and petitioner's knowledge his victim was liberated unharmed, thus eliminating the jury's power to impose the death penalty, make it unreasonable to believe petitioner actually thought a jury trial could cost him his life. Moreover, the arraignment transcript records petitioner's statement that he *fully understood* the charges against him.

"Petitioner now maintains his attorney, Mr. Shumate, told him that he could receive a death sentence after a jury trial. This claim is contradicted by the arraignment transcript which *records* Mr. Shumate's statement *that he did not explain* the penalty to petitioner on the one hand and petitioner's allegations in his first motion to vacate *alleging Mr. Shumate asked petitioner only three questions*—his age, his marital status, his criminal record.

\*   \*   \*   \*   \*   \*

"In the instant matter petitioner's plea of guilty was 'voluntarily and intelligently made \* \* \* with adequate advice of counsel \* \* \* and there is nothing to question the accuracy and reliability of \* \* \* [his] admissions that \* \* \* [he] committed the crimes \* \* \* charged'."

We have written at the above length to make clear the basis for our conclusions that the District Judge's opinion is a factual finding that Burton's now deceased lawyer did not advise him to plead guilty to avoid a possible death sentence; that the lawyer did not tell him that because a state trooper was the kidnap victim, the government would ask for the death penalty; that at the time he pleaded guilty he knew that the kidnap victim had been released unharmed and that he was in no way exposed to a death penalty should he demand a jury trial; that Burton was not coerced in his plea by fear that a trial could result in a death penalty.

Burton argues that his claimed conference with his lawyer does not appear of record and therefore an evidentiary hearing must be had. The colloquy which preceded Burton's plea is not challenged and refutes Burton's relevant assertions of fact. We are further satisfied that "the motion [before the District Judge] and the files and records of the case conclusively show that the prisoner [Burton] is entitled to no relief \* \* \*," within the meaning of 28 U.S.C § 2255.

Any reading of the colloquy set out in the appendix to the opinion can lead to only one conclusion—that his story of his

now deceased attorney's coercive advice, first detailed in his affidavit of May 25, 1970, some twelve years after the event, is perjury. We do no more than employ the Court's admonition in Machibroda v. United States, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962), where the Court said:

"The language of the statute does not strip the district courts of all discretion to exercise their common sense."

Judgment affirmed.

## APPENDIX

### ARRAIGNMENT, PLEA AND SENTENCE

(Filed March 14, 1958)

■ ASSISTANT U. S. ATTORNEY JONES: If the Court please, I'd like to call at this time No. 24,997 for the purpose of appointment of counsel.

BY THE COURT: United States v. Harold Wayne Davis and Carl Edward Burton.

(DEFENDANTS APPEAR BEFORE COURT WITHOUT COUNSEL)

BY THE COURT: Harold Wayne Davis?

MR. DAVIS: Yes, sir.

BY THE COURT: Your name is Harold Wayne Davis?

MR. DAVIS: Yes, sir.

BY THE COURT: And this is Carl Edward Burton?

MR. BURTON: Yes, sir.

BY THE COURT: These two defendants are charged in a two-count indictment, in the first count with kidnapping and in the second count with transporting a stolen motor vehicle knowing it to have been stolen and transporting it in interstate commerce.

Do either of you have counsel?

MR. DAVIS: We don't at this time.

BY THE COURT: Would you like to have?

MR. BURTON: Yes, sir, we'd like to talk to an attorney.

■ BY THE COURT: Mr. Clare * * *

MR. SHUMATE: Mr. Clare just left, Your Honor.

BY THE COURT: Mr. Shumate, will you talk with these two defendants, please?

MR. SHUMATE: Yes, sir.

BY THE COURT: If there's any conflict in interest, we'll appoint counsel for the other defendant. You may talk with them.

(WHEREUPON, MR. W. S. SHUMATE, ATTORNEY OF THE LOUISVILLE, KENTUCKY, BAR, WAS APPOINTED AS COUNSEL FOR THE DEFENDANTS. MR. SHUMATE AND DEFENDANTS LEAVE COURTROOM TO CONFER REGARDING THE CHARGES.)

MR. SHUMATE: We're ready in this case, Your Honor.

BY THE COURT: Now, these two defendants are charged in a two-count indictment, in the first count with kidnapping and in the second with transporting a stolen motor vehicle. Do they desire formal arraignment?

MR. SHUMATE: No, Your Honor, they do not. This is Davis (indicating), and this is Burton. They admit identity of persons. They have received a copy of the indictment, and they waive formal arraignment and plead guilty to the charges; first and second count.

■ BY THE COURT: Now, they fully understand the charges contained in this indictment * * *

MR. JONES: (Interrupting) And the penalties? And the penalty, Mr. Burton and Mr. Davis, that has been fully explained to you?

MR. SHUMATE: I don't think I mentioned the penalty.

MR. JONES: (To the defendants) That you may receive a sentence of any number of years or life, in the discretion of the Court, upon a plea of guilty on Count 1, and as to Count 2 that the penalty is a fine of not more than $5,000.00 or imprisonment of five years, or both?

You do understand? That has been explained?

MR. BURTON: You've just explained it.

MR. SHUMATE: I didn't explain that to them. You've just mentioned it.

MR. JONES: If the Court please, you might read that section.

BY THE COURT: This is a charge which is contained in the first count of your indictment. It's Section 1201 of Title 18; it says: "(a) Whoever knowingly transports in interstate or foreign commerce, any person who has been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall be punished (1) by death if the kidnapped person has not been liberated unharmed, and if the verdict of the jury shall so recommend, or (2) by imprisonment for any term of years or for life, if the death penalty is not imposed.

"(b) The failure to release the victim within 24 hours after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away shall create a rebuttable presumption that such person has been transported in interstate or foreign commerce.

"(c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished as provided in subsection (a)."

That is the charge that has been placed against you by the grand jury in the first count of this indictment. And, as I have mentioned before, and as you probably—undoubtedly understand, in the second count you are charged with transporting a stolen motor vehicle, to-wit, a 1958 Chevrolet automobile, from the vicinity of Van Buren, State of Missouri, to McCracken County, State of Kentucky, and that you then knew that the motor vehicle was stolen.

Now, do you fully understand the charges that the grand jury has placed against you?

MR. BURTON: Yes, sir.

MR. DAVIS: Yes, sir.

BY THE COURT: And how do each of you plead to the two counts of this indictment?

MR. BURTON: Guilty, Your Honor.

MR. DAVIS: Guilty, Your Honor.

BY THE COURT: Each of the defendants, individually and vocally, have entered a plea of guilty to each of the two counts of this indictment.

Now, does the United States desire to make a recommendation in this case?

MR. JONES: If the Court please, the facts as reflected in the investigation that are—let me get the report—on February 1, 1958, Missouri State Trooper Little, together with a sheriff, observed the two defendants in a 1935 automobile, coming down the highway. The subjects were stopped in a little community there by the name of Van Buren, or on the outskirts of Van Buren. At that time they were questioned, and it appears that a pistol was found, and they were questioned concerning the pistol. And they were able to satisfactorily show that it was their pistol by a bill of sale. And at about that time—and the pistol was given back to them. And at about that time there was noticed in the back of the vehicle a sawed-off shotgun. And with that, why the two were ordered to step from their car, according to my information. And at that time a pistol was put upon the law enforcement officers and they were taken then to this filling station across the road.

There were at least two people— I believe, two people in the filling station—

MR. BURTON: (Interrupting) There was six in there.

MR. JONES: (Continuing)—one a woman.

MR. BURTON: And a woman.

MR. JONES: And I understand the door was locked at that time, the people having observed this activity out in front. However, they were compelled to open the door, which they did. And at

that time there appeared quite a dilemma for these two defendants, because they had two officers under their control at that time.

There ensued a conversation as to what to do, and it was finally decided, first that a—the woman would be taken as a hostage, and then as it turned out the policeman was taken instead, and the policeman, in the police car, which is the subject of Count 2—the vehicle described in Count 2 is the State Police automobile —and proceeded down the highway. I forget now who was in the car with the State Policeman, but—

MR. BURTON: (Interrupting) That was me.

MR. JONES: That was you?

MR. BURTON: Yes.

MR. JONES: That was Burton. And Davis brought the other car along, and they proceeded that way for some distance.

BY THE COURT: Each in the police car?

MR. JONES: Beg your pardon?

BY THE COURT: Each in the police car?

MR. JONES: Mr. Burton and the Trooper were in the first car and Davis followed in the other automobile.

BY THE COURT: In your car?

MR. JONES: That was for a short distance, and they abandoned the other car and all three proceeded in to Cairo, Illinois, and from there into the Paducah section in the State Police car.

By the time—before they hit the state line, there had been a broadcast over the police radio advising all authorities to, if they valued the life of Little, to stay away. And for that reason, by the time they actually got in to Paducah, there was a convoy of many automobiles, Illinois Troopers and Missouri Troopers. They were expected by the host troopers of the Kentucky State Police, and also police of the Paducah Police Department. So, actually, there were many, many police cars there in Paducah.

BY THE COURT: How far is Van Buren, where this kidnapping took place, to Cairo, or to Paducah?

MR. JONES: (To F.B.I. agent) Mr. Glover, do you know the answer?

MR. PRICE GLOVER: From Cairo to Paducah is 50 miles. I cannot give you the mileage from Van Buren to the Missouri bridge.

MR. BURTON: It's 149 miles.

MR. JONES: Mr. Burton advises it's 149 miles.

BY THE COURT: From Van Buren to Paducah, very well.

MR. JONES: At that time the—there was gunfire. Fortunately, no one was injured. The Paducah Police Department cut loose with a magnum, and fortunately the projectile just creased the hat of State Trooper Little who flung himself on the floor.

MR. BURTON: I'd like to correct that.

MR. DAVIS: Correct that.

MR. BURTON: I told him to get to the floorboard in the front seat, and he did.

MR. JONES: And it was at your direction that he did get on the floorboard?

MR. DAVIS: The reason that his hat got creased was because a gun went off accidentally in the back seat.

MR. JONES: That was from a bullet inside.

MR. DAVIS: Yes.

MR. JONES: It was my information that the bullet came from one of the police cars and not from a bullet in this car.

BY THE COURT: Did these defendants return [10] the fire?

MR. JONES: They did, at the police cars, firing through the back window, is that not true, Mr. Burton?

MR. BURTON: Yes, sir.

BY THE COURT: How many shots?

MR. JONES: (To Mr. Glover) Do you know how many shots?

MR. GLOVER: I know the Paducah Police—

MR. JONES: (Interrupting) How many shots were fired back?

MR. GLOVER: I know one at the Paducah police car and one at the Kentucky State car.

MR. JONES: This is Mr. Price Glover, Resident Agent of the F.B.I. at Paducah, Kentucky.

Now, at that time, the pursuit was called off to some extent for fear of injury naturally to the occupants of the car and to the Trooper. And Mr. Burton and Mr. Davis managed to evade this convoy of police vehicles.

Mr. Burton is from Paducah, or he's familiar with that section, and by his knowledge was able to escape. The subjects wound up in Milburn, Kentucky, a little community approximately 15 miles from Paducah on the county line of McCracken County where the Trooper was instructed to go to this farm house and advise the occupants of the house that he was there for the purpose of making a search. Actually he was acting on instructions. They were looking for a place at that [11] time to hide themselves and conceal the car which they were in.

These two gentlemen proceeded behind the Trooper and the house and the occupants were taken over. At that time there was widespread television coverage going on in the Paducah area, and it's my understanding that every 15 minutes broadcasts were made advising the subjects to surrender and advising them of the consequences of injury to Little, should any occur.

It is my understanding from the investigative reports that Mr. Burton decided that he'd had enough of the whole affair and left the house for the purpose of giving himself up in response to the pleas and the advice of the broadcasts.

So much for Mr. Burton. He did—he was subsequently arrested enroute, as I understand, to surrender himself, is that right?

MR. GLOVER: Yes, sir.

MR. JONES: In the meantime, back at the farm house, was Mr. Davis. He was uncomfortable with the proposition, and he advised the occupants there that he was going to go outside and kill himself, and for them to stay where they were until they heard a shot. I'm referring to "they", they are Mr. and Mrs. Shelton, the owners and occupants of the farm house, and Trooper Little who was there.

BY THE COURT: Were these occupants of this farm house harmed in any way?

MR. GLOVER: No, sir, they were not. They [12] were man and wife.

MR. JONES: No, sir. Thereafter, Mr. Davis went out, and with that Trooper Little went out the other way. And his police cruiser had been parked in sort of a barn-garage type of affair, and he proceeded to contact the Missouri troopers who were operating on his radio frequency in that area.

About that time a shot was heard, and everyone ran and they found that the defendant Davis had shot himself. It was believed at that time that Mr. Davis was dead, and a call was put in for a hearse to come out and take the body, the body of Davis. The hearse arrived, and at that time there was some slight movement on the part of Davis, and they found that instead of being dead Mr. Davis was critically wounded. With that, he was rushed to the Paducah hospital and, as you can see, his life was saved.

Those are the facts, if the Court please, surrounding this. The Court will notice the charge that the trooper was used as a means of transportation and for the purpose of serving as a hostage. I might say that unfortunately as a result of their overall activities, though directly they have no part in it, indirectly they must morally share, though not legally, the responsibility for the death of a nosey citizen in that community who—a woman—who proceeded through a roadblock with a friend, and as a result of

the conduct of the car shots were fired and she was fatally wounded. [13] Had it not been for all of this affair of course there would have been no need for roadblocks, and there would not have been her inadvertent death. It's a tragic affair.

Both of these defendants have prior criminal records known to the United States Attorney's office. The subject Carl Burton in 1956 paid a $50.00 fine and received a 5-day sentence in Long Beach, California, on the charge of carrying a concealed deadly weapon. In May 12, 1951, he was arrested in Paducah on a charge of operating an automobile without the operator's license, a misdemeanor. He is a veteran of Navy service, was charged five time with AWOL. And there was a juvenile record, I believe—am I right in this, Carl—for burglary.

MR. BURTON: I wasn't—yes, sir. I wasn't AWOL five times from the Navy. That's correct.

MR. JONES: Court martialed three times; charged five times and court martialed three?

MR. BURTON: Yes, sir.

MR. JONES: As for the defendant Davis, his criminal record—the reason for this delay—Mr. Davis, because of his injuries, has not been fingerprinted and we do not have the fingerprint report back on him at this time. However, I am familiar with certain of his record, and in 1950—from 1950 to '55—and, Carl, if you will * * * not Carl, but Mr. Davis, is it true you were in San Quentin from '50 to '55 on a charge of assault?

MR. SHUMATE: Yes, sir.

MR. JONES: There is probably a detainer on both of them from the state of California, particularly growing out of a shooting by Mr. Burton, or the alleged shooting by Mr. Burton, of a police officer there. The bullet hit him in the mouth and came out the back. Fortunately, instead of murder, the policeman did recover after a six-months' period, and there is a detainer growing out of that charge.

It is a very serious offense, if the Court please. It is the recommendation of the United States Attorney that each of the defendants receive a sentence of life on Count 1 of this indictment, and that in addition a sentence of five years on Court 2 as to each defendant, those sentences to run concurrent, not consecutive, but concurrent each with the other, making an aggregate life sentence on both counts.

BY THE COURT: All right. Do these defendants or their counsel have anything to say before sentence of the court is imposed?

MR. SHUMATE: If it please the Court, the defendant Davis is 33 years of age. He has a family in California, wife and four children. He had some trouble when he was a juvenile, and then he had this one conviction in 1950 for assault and for which he said he served six years at San Quentin.

The defendant Burton is 24 years of age; he's married and has a family in California, a wife and two boys. [15] He had some juvenile charges and was convicted on a misdemeanor in California for which he served five days. But he had no prior felony record of felony convictions.

Both of these defendants state that at the time these officers stopped them, they had no intention to kidnap anybody, but when the pistol was given back to them, and it was theirs, and the car they were in was Mr. Davis', that the officers then saw this shotgun in the car which was illegal for them to have. And they became frightened about being arrested there for having the shotgun, and on the spur of the moment they pulled a gun on the officers. And from then on they just had something that they couldn't turn loose. They state that they had no intention to harm anybody or harm the officer, and that they did regret what they'd done, but of course there could be nothing done about that.

And Davis states he shot himself because he so regretted what they'd done and was ashamed of what he'd done.

And at this time the defendants state that they would like to throw themselves upon the mercy of the Court and that they feel that since this wasn't a premeditated thing, that it was a spur of the moment thing, they realize how serious it was, that they feel that possibly the Court might give them some consideration.

MR. JONES: I might—I would like to ask, if the Court please, if each—if both of the defendants—Have I fairly and correctly stated the facts?

 MR. BURTON: Yes, sir.

MR. DAVIS: Yes, sir.

MR. SHUMATE: I think they have cooperated fully with everybody. But they were just into something that they couldn't pull out of after they got in, Judge.

BY THE COURT: Harold Davis, you have heard the recommendation of the United States. Counsel has spoken in your behalf. Is there anything that you personally would care to say to the Court?

MR. DAVIS: No, except that I'm just sorry, that's all.

BY THE COURT: Mr. Carl Burton, is there anything that you would like to say to the Court?

MR. BURTON: No, sir; there isn't.

BY THE COURT: Of course, there's no need for me to say, I'm sure that both of you realize the seriousness of the offense for which you stand convicted. (To Mr. Jones) When would these defendants be eligible for parole?

MR. JONES: Fifteen years.

BY THE COURT: Fifteen years. Mr. Burton, you're 24 years of age?

MR. BURTON: Yes, sir.

BY THE COURT: And how old are you, Davis?

MR. DAVIS: 33, Your Honor.

BY THE COURT: I'm going to accept the [17] recommendation of the United States.

Each of these defendants, Harold Wayne Davis and Carl Edward Burton, will be sentenced to life imprisonment on the first count of this indictment. They shall further be sentenced to five years on each—each of them, on the second count of this indictment. Said sentences shall run concurrently each with the other.