# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

AMAR GERALD FOUNTAIN,

        Defendant-Appellant.

UNPUBLISHED
April 10, 2018

No. 335034
Wayne Circuit Court
LC No. 16-004046-01-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY ADAMS, JR.,

        Defendant-Appellant.

No. 335072
Wayne Circuit Court
LC No. 15-010388-02-FC

---

Before: GADOLA, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals, defendants, Amar Gerald Fountain ("Fountain") and Anthony Adams, Jr. ("Adams), were tried together before separate juries. Fountain's jury convicted him of assault with intent to murder ("AWIM"), MCL 750.83, armed robbery, MCL 750.529, carjacking, MCL 750.529a, carrying a concealed weapon ("CCW"), MCL 750.227, felon in possession of a firearm ("felon in possession"), MCL 750.224f, possession of a firearm during the commission of a felony ("felony-firearm"), MCL 750.227b, and fourth-degree arson, MCL 750.75(1). Fountain was sentenced to 900 months to 85 years' imprisonment for each of the AWIM and carjacking convictions, one to five years' imprisonment for each of the CCW, felon in possession, and arson convictions, and five years' imprisonment for felony-firearm conviction (second offense).

Adams's jury convicted him of the lesser charge of assault with intent to do great bodily harm less than murder ("AWIGBH"), MCL 750.84, armed robbery, carjacking, and felony-firearm. The jury acquitted Adams of CCW and felon-in-possession. He was sentenced as a

-1-

fourth habitual offender, MCL 769.12, to two to ten years' imprisonment for the AWIBH conviction, 570 months to 85 years' imprisonment for each of the armed robbery and carjacking convictions, and two years' imprisonment for the felony-firearm conviction.

We affirm defendants' convictions, but remand for resentencing before a different judge.[1]

## I. BASIC FACTS

A carjacking and robbery occurred in the early morning hours of December 5, 2015 at a Sunoco gas station in the City of Detroit. The incident was captured on surveillance footage. At approximately 4:18 a.m., the footage showed two men exit a sedan and approach an SUV. The SUV's driver, Michael Thomas ("Thomas"), was at the rear of his vehicle, putting air in the tire, when one of the men brandished a weapon and demanded his glasses. The man shot Thomas in the leg twice. Meanwhile, the other individual who had exited the sedan entered the SUV on the driver's side and appeared to try and start the vehicle. A passenger in the back seat, Michael Washington ("Washington"), shot the individual. The second individual staggered out of the SUV and returned to the sedan.

At trial, Adams conceded that he was the individual who entered the SUV. His identity was never in question. However, Adams argued that he was drunk at the time and that his intoxication, along with the fact that he was shot in the neck, prevented him from remembering exactly what happened. The issue at trial for Adams was his intent and the extent of participation in the robbery and carjacking.

For his part, Fountain argued that the prosecution failed to identify him as the individual who shot Thomas. Fountain's attorney pointed out that the surveillance footage was unclear and that none of the eyewitnesses identified Fountain as the perpetrator. In fact, the SUV's front seat passenger, Carlette Washington (a/k/a Carlette Bradley) ("Carlette"), actually chose a different individual from a photo array. The other rear seat passenger in the SUV, Aaron Lott ("Lott"), fled from the car when Adams entered the front seat and admitted that he never saw the individual who shot Thomas. The prosecutor countered that substantial circumstantial evidence confirmed Fountain's identity. In addition to the surveillance footage from the gas station was surveillance footage from Sinai Grace, where Adams was dropped off after being shot. The same sedan that was at the gas station is captured in footage from the emergency room entrance. This sedan, which was previously reported stolen, was later found burned. At the time of his arrest, Fountain had flash burns on his face and hands. Clothing similar to what the perpetrator

---

[1] Both Fountain and Adams have filed supplemental appellate briefs in propria persona pursuant to Administrative Order 2004-6 ("Standard 4" briefs). Fountain's Standard 4 brief was untimely and exceeded the 50-page limit for such briefs. In any event, we have thoroughly examined Fountain's additional claims of error and find them to be without merit. Claims of error in Adams' Standard 4 brief will be discussed in greater detail below. We denied Adams's motion to amend his Standard 4 brief to allege new claims of error. *People v Adams*, unpublished order of the Court of Appeals, entered March 15, 2018 (Docket No. 335072). However, we have thoroughly examined these additional claims of error and find them to be without merit.

wore in the gas station footage was seized from Fountain's girlfriend's home. The issue at trial for Fountain was whether he was properly identified as the individual with Adams when the robbery and carjacking took place.

## II. SUFFICIENCY OF THE EVIDENCE

Both defendants argue that the evidence was insufficient to sustain their convictions. "This Court reviews de novo defendant's challenge to the sufficiency of the evidence." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "We view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *Id*.

### A. FOUNTAIN

Fountain does not challenge the elements of the offenses; instead, he argues that the evidence was insufficient to show that he was the individual with Adams when the crimes occurred. "[I]dentity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "The elements of an offense may be established on the basis of circumstantial evidence and reasonable inferences from the evidence." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). "It is the jury's duty to determine the weight to be accorded any inferences' and this Court will "not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence." *Id*.

There was sufficient evidence to establish Fountain was with Adams when the crimes occurred. The fact that none of the eyewitnesses could specifically identify Fountain is not fatal in light of the significant circumstantial evidence placing him at the scene. The jury was able to view the surveillance footage from the gas station and observe the individuals involved. Only minutes after the crime, another surveillance camera showed Adams being dropped off at the hospital in the same Sebring sedan that was observed at the gas station. This same sedan was found intentionally burned and Fountain was treated for flash burn injuries. Items taken from Fountain's girlfriend's home contained Adams's DNA as well as the distinctive red pants of the other perpetrator. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that Fountain's identify was proven beyond a reasonable doubt.

### B. ADAMS

In contrast to Fountain, Adams readily concedes that he was present at the time the crime occurred. However, he argues that the evidence was insufficient to show that he aided and abetted Fountain in the AWIBH, armed robbery, and felony-firearm. He also argues that he did not have any intention to steal the SUV and, therefore, he did not have the state of mind to sustain a conviction for carjacking. As previously stated, "[t]he elements of an offense may be established on the basis of circumstantial evidence and reasonable inferences from the evidence." *Dunigan*, 299 Mich App at 582. "Intent may be inferred from all the facts and circumstances," including a defendant's own acts. *People v Cameron*, 291 Mich App 599, 615; 806 NW2d 371 (2011). "Because of the inherent difficulty of proving a defendant's state of mind, only minimal circumstantial evidence from which intent may be inferred need be presented." *Id*.

The carjacking statute, MCL 750.529a, provides:

-3-

A person who in the course of committing a larceny of a motor vehicle uses force or violence or the threat of force or violence, or who puts in fear any operator, passenger, or person in lawful possession of the motor vehicle, or any person lawfully attempting to recover the motor vehicle, is guilty of carjacking, a felony punishable by imprisonment for life or for any term of years.

Adams admitted that he got into Thomas's vehicle but argues that he was too drunk to form the requisite intent to commit a larceny. "[T]he specific intent necessary to commit larceny is the intent to steal another person's property." *People v Cain*, 238 Mich App 95, 120; 605 NW2d 28 (1999). Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have reasonably found that the essential elements of carjacking were proven beyond reasonable doubt. At the same time Fountain was robbing Thomas, Adams entered Thomas's vehicle uninvited, got into the driver's seat of a vehicle that did not belong to him, ordered Carlette to get out of the vehicle, and shut the driver's side door. Adams was in the process of trying to start the vehicle when Lott shot him from the back seat. Again, given the difficulty in proving an actor's intent, "only minimal circumstantial evidence from which intent may be inferred need be presented." *Cameron*, 291 Mich App at 615.

Adams was also found guilty on the theory of aiding and abetting Fountain in AWIGBH, armed robbery, and felony-firearm.

The elements of AWIGBH are "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014) (quotation marks and citation omitted). In order to obtain a conviction for armed robbery, a prosecutor must prove that:

(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Gibbs*, 299 Mich App 473, 490–91; 830 NW2d 821 (2013), quoting *People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

Finally, "[t]he elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *People v Taylor*, 275 Mich. App. 177, 179; 737 NW2d 790 (2007) (citation omitted).

At trial, the prosecution's theory was that Fountain was the individual who committed the foregoing crimes, with Adams acting as an aider and abettor. The aiding and abetting statute, MCL 767.39, provides that a defendant may be convicted if he aided or abetted in the commission of a charged crime. The statute reads:

Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Therefore, in order to be convicted under an aiding and abetting theory, the prosecution must prove:

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

"The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004). "In determining whether a defendant assisted in the commission of the crime, the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime." *Id.* at 71. Whether and to what extent a defendant acts or gives encouragement "must be determined on a case-by-case basis." *Id.* Moreover,

[A] defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense. [*Robinson*, 475 Mich at 15.]

Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to support the jury's verdict that Adams was guilty of aiding and abetting Fountain. Adams not only knew of Fountain's intent to rob Thomas of his glasses, but also commented on how nice the vehicle was. Both Adams and Fountain exited the Sebring at the same time, with Adams proceeding to the driver's seat of the SUV while Fountain drew a gun on Thomas and ordered Thomas to turn over his glasses. Adams's participation clearly aided and encouraged Fountain in word and deed.

### III. EFFECTIVE ASSISTANCE OF COUNSEL

Both defendants argue that they were deprived of the effective assistance of counsel. "[A] defendant must move in the trial court for a new trial or an evidentiary hearing to preserve the defendant's claim that his or her counsel was ineffective." *People v Heft*, 299 Mich App 69,

80; 829 NW2d 266 (2012). Neither defendant moved for a new trial, nor did they request a *Ginther*[2] hearing. "Unpreserved issues concerning ineffective assistance of counsel are reviewed for errors apparent on the record. If the record does not contain sufficient detail to support defendant's ineffective assistance claim, then he has effectively waived the issue." *People v Lockett*, 295 Mich App 165, 186; 814 NW2d 295 (2012). Constitutional claims are reviewed de novo on appeal. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014).

Under both the United States and Michigan constitutions, a criminal defendant has the fundamental right to the effective assistance of counsel. US Const Am VI, Const 1963, art 1. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052, 2065; 80 L Ed 2d 674 (1984). "There is a presumption of effective assistance of counsel, and the burden is on defendant to prove otherwise." *People v Roscoe*, 303 Mich App 633, 644; 846 NW2d 402, lv den 497 Mich 946 (2014).

"To establish a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense. In order to demonstrate that counsel's performance was deficient, the defendant must show that it fell below an objective standard of reasonableness under prevailing professional norms. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy." *People v Riley*, 468 Mich 135, 140; 659 NW2d 611 (2003), citing *Strickland v Washington,* 466 US 668, 687; 104 S Ct 2052; 80 L Ed2d 674 (1984).

A defendant must further affirmatively prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. Therefore, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside judgment in a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

## A. FOUNTAIN

Fountain argues that he was denied the effective assistance of counsel during voir dire and opening statements when his attorney appeared to concede his presence at the gas station. "Mere presence" was not Fountain's defense at trial and he argues that it made no sense to have two diametrically opposed positions presented to the jury.

After reviewing the record, we do not find that counsel's statements conceded Fountain's presence at the scene of the crime. Even if Fountain could demonstrate that counsel's performance fell below an objective standard of reasonableness, he cannot demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. In addition to the surveillance footage from the gas station and the hospital, there was

---

[2] *People v Ginther,* 390 Mich 436; 212 NW2d 922 (1973).

-6-

overwhelming circumstantial evidence that Fountain was the perpetrator, as previously discussed.

## B.  ADAMS

In his Standard 4 brief, Adams claims that defense counsel gave him bad advice, causing him to reject a favorable plea deal.  To establish prejudice arising out of the rejection of a plea bargain offer, a defendant must demonstrate a reasonable probability that he would have accepted the offer if he had been afforded effective assistance, that there was a reasonable probability that the plea would have been completed without withdrawal by the prosecutor or rejection by the court, and that there was a reasonable probability that the defendant's plea would have been to a lesser charge or subject to a lesser prison sentence. *Missouri v Frye*, 566 US 134, 148; 132 S Ct 139; 182 L Ed 2d 379 (2012); *People v Douglas,* 296 Mich App 186, 206-207; 817 NW2d 640, aff'd in part and rev'd in part 496 Mich 557 (2014).

Adams has failed to demonstrate a reasonable probability that he would have accepted the offer if he had been afforded effective assistance.  A careful review of the record reveals that Adams would have rejected the plea bargain regardless of the advice of counsel or even the court.  Adams was committed to going to trial, convinced that he could not be found guilty as an aider and abettor.

## IV.  SENTENCING

Both defendants argue that the trial court punished them for failing to take plea deals and insisting on proceeding to trial.  We agree.

The trial court judge plainly encouraged Adams to accept a plea deal at his July 22, 2016 final conference.  The prosecutor had offered that if Adams pleaded to carjacking, he would receive 10 to 20 years' imprisonment plus two additional years for felony-firearm.  The parties were not exactly sure of the guidelines range but believed it was 18 to 35 years.  Addressing Adams, the judge indicated:

> If you're convicted, you'll be sentenced at the top of your guidelines, not to punish you for going to trial, but it's just standard practice in this courtroom that after trial, people do not get the bottom of their guidelines. So if the top of your guidelines is like 30 years to something, that's what you'll get if you're convicted, okay.

At Fountain's final conference, the prosecutor advised the trial court that Fountain had been offered a plea deal of 20 years for the armed robbery conviction, plus an additional five years for the felony-firearm.  The trial court reviewed the evidence with Fountain, noting that there was surveillance video and other evidence incriminating Fountain.  She added:

> Mr. Fountain, I'm not trying to scare you. I'm not trying to intimidate you, and I'm not trying to force you to do anything that you don't want to do, but if you're convicted, you'll be sentenced at the top of the guidelines. The guidelines are discretionary. I really don't have to follow them any more, but under the circumstance, you know, it is this courtroom's practice that after trial, people get

sentenced at [the] top of their guidelines or higher. Not to punish people that go to trial because you have a right to go to trial, but to reward people who are willing to accept responsibility for what they have done and not go through a trial and admit responsibility before trial you get the bottom. After trial, all bets are off.

Both defendants appeared before the court at a July 29, 2016 final conference hearing. The prosecutor advised the trial court that she had made Fountain a final offer whereby if Fountain pleaded guilty to carjacking and felony-firearm, the prosecutor would withdraw the habitual offender notice and the remainder of the charges; Fountain would receive 25 to 40 years' imprisonment for the carjacking conviction consecutive to the five-year sentence for felony-firearm. Fountain's guidelines were 270 to 900 months. The trial court again reviewed the evidence that the prosecutor intended to introduce at trial, but Fountain declined the plea and opted to go to trial.

As for Adams, the prosecutor advised the trial court that she had made Adams a final offer whereby if Adams pleaded guilty to carjacking and felony-firearm, the prosecutor would withdraw the habitual offender notice and the remainder of the charges; Adams would serve 10 to 20 years' imprisonment for the carjacking conviction to be served consecutive to the two-years sentence for felony-firearm. Adams's guidelines were 225 to 750 months. As with Fountain, the trial court reviewed the potential evidence against Adams, who remained committed to going to trial.

At sentencing, the judge addressed Fountain, who was complaining about the fairness of his trial:

> How much time? [900 months is] lot of time. That is 75 years. Tell me why I shouldn't give you every minute of that 75 years that your sentence[ing] guidelines say you should get; that's what I want to hear. You can say whatever you want to say but just make sure at some point you get to the part where you tell me why you don't deserve 75 years after the prosecutor made you an offer of 15 to 30 plus five. You could have done 20 years and I told you at that time when you rejected that offer that if you were convicted I was going to sentence you at the top of your guidelines, which we know now are 900 months so, Mr. Fountain, this is your moment. You can say whatever you want to say but at some point you need to get to the part where you tell me why I shouldn't keep my promise to you and sentence you to the top of your guidelines because I tried to convince you to take that offer and you didn't and I promised you if you were convicted you were getting the top of your guidelines which is 75 years so go ahead, Mr. Fountain.

The judge then addressed Adams:

> What would you like to say, Mr. Adams, before I impose sentence and, again, you can say whatever you want to say. It's your moment to speak but remember the main thing I want to hear is why I shouldn't sentence you at the top of your guidelines which are 59 years when I promised you when they made you that offer of 10 to 20 plus two, so you could have been out in 12 years and I told you if you didn't accept that and you were convicted that I would likely sentence

-8-

you at the top of your guidelines which starts at 59 years to feel free to say whatever you want to say. This is your opportunity to speak but at some point tell me why I shouldn't give you what I promised you which is the stop [sic] of your guidelines.

Finally, the judge addressed both defendants and explained her rationale for their sentences:

> Well, gentlemen, I will never understand why faced with the evidence that was presented to you in advance of trial why you chose to roll the dice and go to trial.

> * * *

> The jury has found you guilty of committing this crime and it's your fault that even when presented with all of this overwhelming evidence against you, you all chose to walk away from the opportunity to be available for parole for Mr. Fountain in 20 years you could have been out and for you, Mr. Adams, in 12 years, you would have been out. You all chose not to do that. It was 15 to 30 plus five for you, Mr. Fountain, and it was 10 to 20 plus two for you. You all could have been out when you still would have been very young men with an opportunity to turn your life around and become productive members of society.

> The lives of those black people that you chose to rob that day didn't matter and your own black lives didn't matter to you. You know we can't expect anybody else in this world to care about the lives of young black men until you all start caring. You grew up without a dad, Mr. Adams. You lost your dad to the system. You knew you had a baby boy that you wanted to be apart [sic] of his life when you chose not only to commit this crime but to reject the opportunity to be able to go home and see him in 12 years so, you know, I'm a promise keeper and my promise to you all was that I would sentence you to the top of your guidelines if you were convicted and that's exactly what I'm going to do.

The trial court's policy of sentencing defendants who proceed to trial at the top of the guidelines range was soundly rejected in *People v Smith*, unpublished per curiam opinion of the Court of Appeals, issued November 22, 2016 (Docket No. 328477), because it resulted in the failure to provide the defendant with an individualized sentence. More recently, this Court has issued a published opinion on the policy, agreeing with *Smith's* rationale: "We agree that a policy of sentencing all defendants who go to trial to the top of the guidelines is fundamentally inconsistent with the principle of individualized sentences." *People v Pennington*, ___ Mich App ___; ___ NW2d ___ (Docket No. 323231), slip op at 8. Our Court explained:

> Courts, including the United States Supreme Court, have sometimes struggled to articulate the precise line between rewarding a defendant for pleading guilty, which is routine in plea bargains, and punishing a defendant for asserting his constitutional right to trial. See *United States v Jackson*, 390 US 570; 88 S Ct 1209; 20 L Ed 2d 138 (1968) (statute found unconstitutional where trial by jury

-9-

provides for a greater possible sentence than bench trial); *Corbitt v New Jersey*, 439 US 212; 99 S Ct 492; 58 L Ed 2d 466 (1978) ("a State may encourage a guilty plea by offering substantial benefits for return for the plea.").

> In this case, however, we need not resolve any tension between these principles. Here, the judge's sentencing policy was to impose the maximum guideline sentence when a defendant was convicted after going to trial. This does not demonstrate a process where a court determines what an individualized sentence should be and then reduces it as an inducement or reward for the plea. Rather, it is an automatic imposition of the maximum guideline sentence; a policy that ignores the requirement of individualized sentencing and promises not a degree of mercy as a reward for a plea, but rather a harsh sentence as a punishment for seeking a trial. Thus, while an admission of guilt may be considered as indicating remorse and may be grounds to lessen punishment that would otherwise be imposed, there is no doubt that sentencing defendants to the top of the guidelines because they went to trial or to increase their sentence in any way for doing so, is a violation of both due process and our law governing sentencing. [*Pennington*, slip op at 8-9 (footnote omitted).]

The same is true here. And, as in both *Smith* and *Pennington*, we remand for resentencing before a different judge.

## V. JUDICIAL MISCONDUCT

Fountain argues that the trial court pierced the veil of impartiality when it refused to abide by the parties' stipulation regarding Thomas's absence. Instead of being told that Thomas was unavailable to testify, the jury was informed that he had been shot and killed while in the presence of Washington. Fountain believes that the information allowed the jury to have greater sympathy for Thomas and further allowed the jury to imagine that Thomas had been killed in retaliation. He urges that the trial court improperly directed the presentation of evidence, exceeding its role as impartial arbiter.

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that [an appellate court] reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

"A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

Contrary to Fountain's argument, the record illustrates that the trial court was primarily concerned with ensuring that the stipulation was accurate and not misleading. The judge heard and rejected all three of the attorneys' arguments, including the prosecutor's. There is absolutely no indication that the court improperly influenced the jury by creating the appearance of

advocacy or partiality against Fountain. In fact, all of the conversations took place outside of the presence of the jury.

## VI. ADAMS'S MOTION FOR MISTRIAL

In his Standard 4 brief, Adams argues that he did not receive a fair trial because the jury was made aware of the fact that Adams was in prison. "This Court reviews for an abuse of discretion the trial court's decision to deny a defendant's motion for a mistrial." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes." *Id*.

Our Court has explained that a mistrial is only appropriate in certain limited circumstances:

> The trial court should only grant a mistrial for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial and when the prejudicial effect of the error cannot be removed in any other way. The trial court may consider, among other things, whether the prosecutor intentionally presented the information to the jury or emphasized the information. [*Lane*, 308 Mich App at 60 (quotation marks and footnotes omitted).]

Craig MacDonald, MSP, testified that he did not personally collect a buccal swab from defendant Adams:

> *Q*. Okay. Did you ever collect a buccal swab from Mr. Anthony Adams?
>
> *A*. No. I – I actually – Mr. Adams was located –
>
> *Mr. Strong*: (Interposing) Objection, your Honor. Objection. He's already answered the question and then he's added upon that and I would consider it to be unresponsive. He said no. He doesn't need to explain it. He just said no. That's my objection.
>
> *The Court*: Overruled. You may continue.
>
> *The Witness*: I – I was going to say he was – Mr. Adams was located out of the area at that time. He was out in Jackson County.
>
> So I called the State Police post in Jackson and had a detective from the Jackson post go to the facility where Mr. Adams was at and collect the same buccal swab that I collected from Mr. Fountain.

Defense counsel moved for a mistrial, arguing that it was obvious that MacDonald was referring to Jackson State Prison. The trial court denied the motion, noting that MacDonald was simply offering an explanation for how evidence was collected.

The trial court did not abuse its discretion when it denied Adams's motion for mistrial. There was no stipulation regarding the physical evidence or lab results and the prosecutor

presented a number of witnesses regarding the chain of custody of certain physical evidence. It is clear that the prosecutor was not seeking to elicit inappropriate testimony and only wanted MacDonald to explain how the evidence was collected. Moreover, MacDonald did not specifically state that Adams was in jail. The trial court reasonably resolved the issue by ordering any future reference be to a hospital.

Defendants' convictions are affirmed and the cases are remanded for resentencing before a different judge. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Michael J. Riordan